## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WIRTGEN AMERICA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 17-770-JDW |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| CATERPILLAR INC., | ) |
| | ) |
| Defendant. | ) |

## CATERPILLAR INC.'S PROPOSED FINDINGS OF FACT
## AND PROPOSED CONCLUSIONS OF LAW

OF COUNSEL:

James C. Yoon
Ryan R. Smith
Christopher D. Mays
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 493-9300

Lucy Yen
Cassie Leigh Black
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel: (212) 999-5800

Matthew A. Macdonald
Neil N. Desai
Naoya Son
Alex J. Turner
WILSON SONSINI GOODRICH & ROSATI, P.C.
953 E. 3rd St., #100
Los Angeles, California 90013
Tel: (323) 210-2900

Dated:  April 12, 2024
11445393/11898.00005

Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant Caterpillar Inc.*

## TABLE OF CONTENTS

**Page**

CATERPILLAR'S PROPOSED FINDINGS OF FACT ..................................................1

I.    WIRTGEN TOOK INCONSISTENT POSITIONS ON THE '309 PATENT...................1

    A.    The '309 Patent ........................................................................................1
    B.    Before the Patent Office, Wirtgen Successfully Argued that the Four-
        Sided Stability Pattern Is Not Inherent ....................................................2
    C.    At Trial, Wirtgen Argued that the Four-Sided Stability Is Inherent .......3

II.   WIRTGEN UNREASONABLY DELAYED IN SEEKING '530 PATENT
    CLAIMS COVERING LEGS THAT ARE NOT EACH INDIVIDUALLY
    ADJUSTABLE ...................................................................................................4

    A.    Caterpillar's Legacy Machines .................................................................5
    B.    The '530 Patent Family ............................................................................5
    C.    Caterpillar's PM600 Series Cold Planers .................................................6

III.  WIRTGEN'S REISSUED '268 PATENT CLAIMS SIGNIFICANTLY
    POSTDATE CATERPILLAR'S SUBSTANTIAL INVESTMENT IN THE
    DEVELOPMENT OF PM600 AND PM800 MACHINES ...................................7

    A.    The Predecessor '659 Patent and the Reissued '268 Patent ....................8

IV.   INVALIDATED CLAIM 1 OF THE '395 PATENT IS INDISTINGUISHABLE
    FROM CLAIM 5 OF THE '788 PATENT UNDER WIRTGEN'S
    INFRINGEMENT THEORY ADVANCED AT TRIAL ....................................8

    A.    The '395 and '788 Patents .......................................................................8
    B.    Claim 5 of the '788 Patent Presents the Identical Issue of Invalidity as
        Invalidated Claim 1 of the '395 Patent ....................................................9
        1.    Claims 1 of the '788 and395 Patents Are Identical .....................9
        2.    Claim 5 of the '788 Patent Adds Only Obvious Limitations to
            Claim 1 of the '788 Patent ........................................................ 10

CATERPILLAR'S PROPOSED CONCLUSIONS OF LAW ....................................11

I.    WIRTGEN IS JUDICIALLY ESTOPPED FROM TAKING INCONSISTENT
    POSITIONS ON THE '309 PATENT ..............................................................12

    A.    Legal Standards for Judicial Estoppel.....................................................12
    B.    The Patent Office Adopted Wirtgen's Prior Position, and Bad Faith Can
        Be Inferred ..............................................................................................13
    C.    Judicial Estoppel Is Tailored to Address the Harm ...............................14

II.   THE '530 PATENT IS UNENFORCEABLE DUE TO PROSECUTION
    LACHES ..........................................................................................................14

    A.    Legal Standards for Prosecution Laches..................................................14
    B.    Wirtgen's Delay in Prosecuting Broadened Claims for the '530 Patent
        Was Unreasonable ...................................................................................15

C.      Caterpillar Suffered Prejudice Attributable to Wirtgen's Delay.............................17

III.    THE '268 PATENT IS UNENFORCEABLE AGAINST CATERPILLAR
        BECAUSE OF EQUITABLE INTERVENING RIGHTS ..................................................18

        A.      Legal Standards for Equitable Intervening Rights..................................................18
        B.      Caterpillar Launched New Products in Good Faith and Has Intervening
                Rights .........................................................................................................................19

IV.     COLLATERAL ESTOPPEL BARS WIRTGEN FROM ASSERTING CLAIM 5
        OF THE '788 PATENT ....................................................................................................20

        A.      Legal Standards for Collateral Estoppel .................................................................20
        B.      Claim 5 of the '788 Patent Adds Only Obvious, Legally Immaterial
                Limitations to Claim 1 of the '788 Patent..............................................................21

V.      CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Akamai Techs. v. Limelight Networks*,
    805 F.3d 1368 (Fed. Cir. 2015)..........................................................................................11

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012)...........................................................................................20

*BIC Leisure Prod. v. Windsurfing Int'l*,
    1 F.3d 1214 (Fed. Cir. 1993)...............................................................................................19

*Biogen Int'l GmbH v. Amneal Pharms. LLC*,
    487 F. Supp. 3d 254 (D. Del. 2020)................................................................................19, 20

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
    No. 1:17-cv-116, 2020 WL 3317105 (N.D. W.Va. June 18, 2020).....................................11

*Cancer Research Tech. Ltd. v. Barr Labs., Inc.*,
    625 F.3d 724 (Fed Cir. 2010)..............................................................................................14

*Caterpillar Inc. v. Wirtgen Am., Inc.*,
    Case No. 19-2294, D.I. 79 (Fed. Cir. Feb. 3, 2021).............................................................3

*Eberle v. Harris*,
    No. 03-cv-5809 (FLW), 2010 WL 6281563 (D.N.J. June 30, 2010)...................................18

*Eli Lilly & Co. v. Hospira, Inc.*,
    933 F.3d 1320 (Fed. Cir. 2019)...........................................................................................17

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002).............................................................................................................14

*Google LLC v. Hammond Dev. Int'l, Inc.*,
    54 F.4th 1377 (Fed. Cir. 2022) ...........................................................................................20

*Hyatt v. Hirshfeld*,
    998 F.3d 1347 (Fed. Cir. 2021).................................................................................13, 14, 16

*IMEG Corp. v. Patel*,
    C.A. No. 20-111-CFC, 2021 WL 184407 (D. Del. Jan. 19, 2021) .....................................13

*John Bean Techs. Corp. v. Morris & Assocs., Inc.*,
    No. 4:14-CV-00368-BRW, 2019 WL 7176779 (E.D. Ark. Sept. 23, 2019),
    *aff'd*, 988 F.3d 1334 (Fed. Cir. 2021) ...........................................................................17, 18

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC.*,
    337 F.3d 314 (3d Cir. 2003)................................................................................................11

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007)..............................................................................................9

*Miller v. Brass Co.*,
 104 U.S. 350 (1881)............................................................................................13

*Montrose Med. Grp. v. Bulger*,
 243 F.3d 773 (3d Cir. 2001).............................................................................12

*New Hampshire v. Maine*,
 532 U.S. 742 (2001)............................................................................................11

*Ohio Willow Wood Co. v. Alps South.*,
 LLC, 735 F.3d 1333 (Fed. Cir. 2013)............................................................20

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
 773 F.3d 1186 (Fed. Cir. 2014)..........................................................................4

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
 57 F.4th 1346 (Fed. Cir. 2023)........................................................................14

*Predicate Logic, Inc. v. Distributive Software, Inc.*,
 544 F.3d 1298 (Fed. Cir. 2008)........................................................................19

*Reiffin v. Microsoft Corp.*,
 270 F. Supp. 2d 1132 (N.D. Cal. 2003) ...............................................14, 15, 16

*Shire Labs, Inc. v. Corepharma, LLC*,
 No. CIV. A. 06-2266 SRC, 2008 WL 4822186 (D.N.J. Nov. 3, 2008)......12, 13

*Sonos, Inc. v. Google LLC*,
 No. C 20-06754 WHA, 2023 WL 6542320 (N.D. Cal. Oct. 6, 2023) .........15, 16

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
 593 F.3d 1346 (Fed. Cir. 2010)........................................................................11

*Trs. of Columbia Univ. in N.Y. v. NortonLifeLock, Inc.*,
 No. 3:13-CV-808, 2019 WL 7040931 (E.D. Va. Dec. 20, 2019) ....................12

*U.S. Ethernet Innovations, LLC v. Tex. Instruments Inc.*,
 No. 6:11-cv-491, 2014 WL 2740383 (E.D. Tex. June 15, 2014) ....................12

*Wang Labs., Inc. v. Applied Comp. Scis., Inc.*,
 958 F.2d 355 (Fed. Cir. 1992)..........................................................................11

*Webster Elec. Co. v. Splitdorf Elec. Co.*,
 264 U.S. 463 (1924)............................................................................................13

*Woodbridge v. United States*,
 263 U.S. 50 (1923)..............................................................................................13

## STATUTES

35 U.S.C. § 252................................................................................................................17

**CATERPILLAR'S PROPOSED FINDINGS OF FACT**

**I.     WIRTGEN TOOK INCONSISTENT POSITIONS ON THE '309 PATENT**

    **A.     The '309 Patent**

    1.     When a typical roadbuilding machine travels over an obstacle with only one wheel, that wheel (and its supporting cylinder) may be raised by the obstacle, causing instability.  *See* Engelmann Decl. ¶¶ 3, 8.[1]  The '309 patent purports to provide an improved suspension system whereby all four supporting cylinders are "positive[ly] couple[d]" so that, when going over an obstacle, they all adjust in response: "the left front wheel and the right rear wheel are adjusted in height in the opposite direction to the right front wheel and the left rear wheel, the left front wheel and the right rear wheel being adjusted in height in the same direction."  Ex. 38[2] ('309 patent) at 6:54-59.  The '309 patent goes on to explain that this positive coupling results in an enhanced, four-sided stability pattern, as depicted in Figure 7:



---

[1] The Engelmann Decl. is incorporated by reference in its entirety.
[2] Exhibit citations refer to the exhibits attached to the Declaration of Naoya Son in Support of Caterpillar's Opening Brief on Estoppel Defenses.

**B.     Before the Patent Office, Wirtgen Successfully Argued that the Four-Sided Stability Pattern Is Not Inherent**

2.      Caterpillar brought an IPR challenge to the '309 patent based on the combination of two prior art sources: Swisher (which disclosed a road milling machine) and Neumeier (which disclosed a front loader machine with the four-way positively coupled actuating members, or cylinders, as described in claim 26 of the '309 patent).  Caterpillar argued that a POSA would have been motivated to modify a road milling machine to incorporate Neumeier's hydraulic cylinder system.

3.      To address the four-sided-stability pattern depicted in the '309 patent, Caterpillar argued that this was an inherent feature of the '309 patent's four-way positive coupling described above.  *See id.* at 6:54-59.

4.      In response, Wirtgen argued that the four-sided stability pattern was *not* inherent:

> [T]he '309 patent ***does not acknowledge the claim feature is inherent***.  Caterpillar selectively relies on the '309 patent's teachings, ignoring those teachings that show the missing element is not necessarily present. The '309 patent states that "[i]f all of the actuating members are designed identically … the height adjustment takes place essentially by equal amounts on all the wheels." ['309 patent] 2:55-58. But the '309 patent adds that this is only theoretical "on the precondition that, for example, the machine frame is indefinitely rigid, the contact area is totally inflexible and the oil is fully incompressible." [*Id.*] at 2:58-63. "In practice, however, minor deviations cannot be avoided." [*Id.*] at 2:63-64. ***Deviations will influence the tilting behavior, and thus the stability pattern, of the road-building machine***. [*Id.*] 2:64-67. Caterpillar ignored these factors in making its inherency argument.

Ex. 1 ('309 POS) at 47-48.[34]

5.      The Patent Office accepted Wirtgen's non-inherency arguments.  Although the Patent Office found claim 26 (describing the four-way positive coupling) of the '309 patent

---

[3] All emphases are added unless otherwise noted.

[4] Along the same lines, Wirtgen pointed to "Caterpillar's European patent EP 0940274 B1 ('Bitelli') [which] show[ed] that the location of a stability pattern's apex between two coupled cylinders is *not inherent*."  *Id.*

obvious, *see* Ex. 12 (IPR2017-02185 Final Written Decision) at 42, it sided with Wirtgen on claim 29, endorsing Wirtgen's non-inherency theory: "While it is possible that the proposed Swisher/Neumeier combination may have a four-sided stability pattern as recited in [claim 29], a mere possibility is not enough . . . a preponderance of the evidence does not establish that the Swisher/Neumeier combination inherently has a four-sided stability pattern . . . ." *Id.* at 54-55. The Federal Circuit affirmed this finding. *See Caterpillar Inc. v. Wirtgen Am., Inc.*, Case No. 19-2294, D.I. 79 (Fed. Cir. Feb. 3, 2021) (Judgment).

### C. At Trial, Wirtgen Argued that the Four-Sided Stability Is Inherent

6. At the trial in this case, Wirtgen adopted a wholly different position. Without any supporting testimony from inventors or engineers, Wirtgen presented its *entire* infringement case for the "four-sided stability" limitation of the '309 patent through a single conclusory opinion of its technical expert, Dr. John Lumkes:

> Q. Professor, when the ride control is active, could you explain why this is in fact four-sided stability pattern?
>
> A. So when the ride control is active and those lines are hooked together, and **one cylinder has to move up and one cylinder has to move down**, it creates a four-sided stability pattern that is shown here. […]
>
> Q. […] How do you determine whether the four-sided stability pattern having a widest transverse dimension transverse to the forward direction of the chassis fell within the footprint of Wirtgen rotor?
>
> A. Yes. So I was provided a CAD, or I think you have heard the term in here, computer-aided design file, a complete parts drawing of the machine, that parts file model, computer model machine and all the dimensions of the machine. From that, ***I was able to determine the stability pattern, it has to occur at the midpoints of the legs, since all the cylinders are equal value***, one goes up and one goes down, it's going to pivot and that is going to cause that pivot point to be in the middle of those legs. Whether it goes up and down, that's the pivoting access of the drawing, the diagram of the center of the point between the front legs, the front to back legs and the rear legs, you get that triangular shape, from that CAD file it has all these documents in there, you see those midpoint lines, draw the stability pattern or the four-side shape and actually look on the CAD file and say yes, it does or doesn't

fall within the working rotor.

D.I. 353 (Trial Tr.) at 595:14-596:24.  Dr. Lumkes concluded that "since all the cylinders [*i.e.,* the actuating members] are equal value," the accused machines must have a four-sided stability pattern.  He did no testing to verify that Caterpillar's machines in fact had that stability pattern: he did not verify that the "machine frame is indefinitely rigid," that "the contact area is totally inflexible," or that "the oil is fully incompressible."  *Cf.* Ex. 1 ('309 POS) at 47-48.  Nor did he do anything to rule out the possibility of "[d]eviations . . . influenc[ing] the tilting behavior and thus the stability pattern" of the PM600 series.  *Id.*  Instead, he stated that because the cylinders were allegedly "of equal value," the four-way stability pattern "necessarily must be present."  *See Pharma.*, 773 F.3d at 1195-96.  That is precisely the opposite of what Wirtgen advocated before the Patent Office.

## II.  WIRTGEN UNREASONABLY DELAYED IN SEEKING '530 PATENT CLAIMS COVERING LEGS THAT ARE NOT EACH INDIVIDUALLY ADJUSTABLE

7.      Wirtgen held out to the world for over a decade that its purported lifting column invention required each machine's legs to be individually adjustable.  Nearly a decade later, after Wirtgen continued to file multiple serial applications on this invention, nearly a year after Caterpillar launched a new product (having invested many millions of dollars on development), and *nine days after* Wirtgen acquired and undertook unknown analysis of Caterpillar's new cold planer, Wirtgen broadened its claimed invention to cover machines with legs that are not individually adjustable:



## A.    Caterpillar's Legacy Machines

8.     Since the 1990s, two of Caterpillar's machines – the PM465 and PM565 – had rear legs that raised and lowered together "with a single manual toggle switch" and were not individually adjustable.  *See* Engelmann Decl. ¶¶ 2-4; Ex. 2 (CAT-770_065297) at 065409 (PM565); *see also* Ex. 3 (CAT-770_048408) at 048412 (PM465: "There is a single raise solenoid and a single lower solenoid for simultaneously controlling both rear legs.").  Wirtgen knew about Caterpillar's leg design; Wirtgen's machines competed against both the PM465 and PM565 in the 1990s, Ex. 4 (Wiley 2023 Dep. Tr.) at 106:16-19, and Wirtgen took some of Caterpillar's machines in trade.  *See id*. at 330:6-20.

## B.    The '530 Patent Family

9.     The '530 patent is the youngest member of a three-patent family that includes the '592 patent and the '871 patent (collectively, the '530 Family).[5]  Each patent claims the general components of a road construction machine such as a machine frame, a milling drum, and ground engaging supports with telescoping legs (or cylinders) that may be adjusted.  According to Wirtgen, its invention was the inclusion of leg sensors inside the cylinders.  The applications for these patents were initiated over 15 years ago:  (1) the '592 patent application on March 12, 2008; (2)

---

[5] The '530 Patent Family also relies on an International Application filed September 12, 2006, and two German patent applications filed in September 2005.  *See* Ex. 6 ('592 patent cover page).

the '871 patent application on January 17, 2012; and (3) the '530 patent application on April 10, 2015.

10.     During the initial '530 application and for all claims granted in the '592 and '871 patents, Wirtgen limited its claims to require that *each* leg of the road construction machine was "individually adjustable."  *See* Ex. 5 ('592 FH Sept. 28, 2010 office action response); Ex. 6 ('592 patent) at claim 1; Ex. 7 ('871 patent at claim 1); Ex. 8 ('530 FH 2015-04-10 filing); Ex. 9 ('530 2015-07-31 preliminary amendment); Ex. 10 ('530 2016-12-22 preliminary amendment); Ex. 11 ('530 2017-01-17 amendment) at 2.

11.     This limitation came early during the prosecution of the first application in the family (the '592 patent) after the Patent Office cited a Caterpillar prior art patent application (Davis) disclosing Caterpillar's design with legs that are linked "so that they act together as if they were a single central jack."  *See* Ex. 39 ('592 file history June 3, 2010 office action) at 4-5; Ex. 13 (Davis] at ¶ 0033, claim 4.  In response, Wirtgen added the modifier "each" to the existing "individually adjustable" language, thereby narrowing the claim.  *See* Ex. 5 ('592 FH Sept. 28, 2010 office action response) at 4-5.

### C.     Caterpillar's PM600 Series Cold Planers

12.     In 2016, eight years after Wirtgen filed for the first patent in the '530 Family and while the '530 patent application was pending, Caterpillar announced the release of a new generation of cold planer machines that included its accused PM620 and PM622 products.  *See* Engelmann Decl. ¶¶ 5-8; Ex. 14 (November 2016 press release).[6]  As with Caterpillar's earlier machines, the rear legs of the PM620 and PM622 are not *each* "individually adjustable" because

---

[6] Although not yet released, the PM800 series was fully designed and nearing its future release date at the time the '530 claims were broadened.  Like the PM600 series, Caterpillar had already invested millions of dollars and thousands of hours in the PM800 series at the time the '530 claims were unexpectedly broadened.  *See* Engelmann Decl. ¶¶ 6-7.

they raise or lower "in unison."  *See id.*; Ex. 15 (CAT0004149) at 4159.  As such, on the day they were released, these machines did not infringe either the '592 or '871 patent, and were not covered by the claim language of the then-pending '530 application.

13.     In December 2016, Wirtgen bought a PM620.  *See* Exs. 26-27 (Trial Exs. 5241, 5244) ("The Caterpillar showed up today"); Ex. 16 (Wiley 2018 ITC Dep. Tr.) at 142:17-144:17.[7] Then, on March 14, 2017, Wirtgen bought another one of the accused machines – this time a PM622 from Europe.  *See* Ex. 29 (Trial Ex. 5295) ("RE: Cat 622" "Bernd bought one from a customer").  Nine days later, after inspecting and undertaking other unknown analysis, Wirtgen made a broadening amendment in the '530 patent application, for the very first time dropping the requirement that the legs be "individually adjustable."  Ex. 17 (2017-03-23 office action) at 2 (striking out "individually").  Under the broadened claim, each claimed machine's legs need only be "adjustable," not "individually adjustable."

14.     The change was significant, and the timing suggests that Wirtgen did it to target Caterpillar's *new* products after their release into the market.  This is clear because Wirtgen could have attempted to include the broader claims from the '530 patent in the predecessor patent applications, but never did so until a new generation of cold planers launched.

## III.   WIRTGEN'S REISSUED '268 PATENT CLAIMS SIGNIFICANTLY POSTDATE CATERPILLAR'S SUBSTANTIAL INVESTMENT IN THE DEVELOPMENT OF PM600 AND PM800 MACHINES

15.     Because the jury found the only asserted claim of the '268 patent (claim 32) to be invalid and not infringed, the Court need only consider enforceability if it overturns the jury's verdict in response to any JMOL motion filed by Wirtgen.

---

[7] Wirtgen obtained a third Caterpillar machine on November 28, 2017.  *See* Ex. 28 (Trial Ex. 5294).

### A.    The Predecessor '659 Patent and the Reissued '268 Patent

16.    The '268 Patent, issued on October 20, 2020, is a reissue of the '659 Patent, issued on April 2, 2013.  Ex. 20 ('268 Patent) at 1.  In this litigation, Wirtgen asserted claim 32 (which depends on claim 14) against Caterpillar.  In litigation between the parties in Italy, Wirtgen's claim 1 of EP '004 – which is comparable to original claim 14 from predecessor '659 patent – was invalidated over Caterpillar's PM565 machine.  *See* Klopp Decl. ¶¶ 8-14 (summarizing proceedings in Italy)[8]; *id.* at ¶ 15, Table 1 (comparing claim language); Ex. 21 ('268 FH excerpts (Milan Action – Court Appointed Expert's Final Opinion) (WA-0013562)) at -645 ("the PM565 machine deprives [claim 1 of] EP 004 of novelty").

17.    Subsequently, on March 23, 2018, Wirtgen filed the reissue application.  During trial, Wirtgen's expert admitted that Wirtgen filed the '268 patent to narrow the claims from the '659 patent and avoid Caterpillar's PM465 and PM565 machines.  *See* D.I. 354 (Trial Tr.) at 823:16-824:4 (acknowledging that Wirtgen "***narrow[ed] the patent*** because [it] found out about the PM465 and the PM565").

## IV.    INVALIDATED CLAIM 1 OF THE '395 PATENT IS INDISTINGUISHABLE FROM CLAIM 5 OF THE '788 PATENT UNDER WIRTGEN'S INFRINGEMENT THEORY ADVANCED AT TRIAL

### A.    The '395 and '788 Patents

18.    The '395 and '788 patents both relate to a sensor-switching feature.  The '395 patent is a "child" patent of the '788 patent.  *See* Smith Decl. ¶ 5 n.7.[9]  Thus, the two patents share a common specification and common inventors.  *See id.* ¶ 19.  Additionally, as discussed in greater detail below, certain of the claims are substantively identical.

---

[8] The Klopp Decl. is incorporated by reference in its entirety.
[9] The Smith Decl. is incorporated by reference in its entirety.

19.     On May 24, 2018, Caterpillar filed an IPR petition challenging the validity of claim 1 and other claims of the '395 Patent over the prior art references Davis and Brabec.  *See* Ex. 25 (Case No. IPR2018-01091-2) at 24-40.  On November 27, 2019, the PTO issued a Final Written Decision invalidating claim 1 and several other claims of the '395 patent as obvious.  *See* Ex. 23 (Case No. IPR2018-01091-49) at 20-41; Smith Decl. ¶ 18.

**B.     Claim 5 of the '788 Patent Presents the Identical Issue of Invalidity as Invalidated Claim 1 of the '395 Patent**

**1.     Claims 1 of the '788 and '395 Patents Are Identical**

20.     As a preliminary matter, because asserted claim 5 of the '788 patent depends on claim 1, the analysis begins there.  As explained in detail in Dr. Smith's declaration and as demonstrated below, claim 1 of the '788 patent and claim 1 of the '395 patent recite the same structural components, and any differences in language are superficial and materially insignificant.  *See* Smith Decl. ¶¶ 18-49.

-9-



Smith Decl. ¶ 23, Fig. 1 (annotated).  Based on an element-by-element comparison, Dr. Smith concluded that "the device recited by claim 1 of the '395 patent is at least substantially the same (if not identical) to the device recited by claim 1 of the '788 patent." *Id.* at ¶ 48.  Dr. Smith further concluded that "to the extent that the Court finds that the devices recited by claim 1 of the '395 patent and claim 1 of the '788 patent are not identical or substantially the same, the device recited by the '395 patent would certainly have been obvious to a PHOSITA in view of the '788 Patent specification and claims."[10]  *Id.* at ¶ 49.

**2.    Claim 5 of the '788 Patent Adds Only Obvious Limitations to Claim 1 of the '788 Patent**

21.    Claim 5 of the '788 patent, which depends on claim 1, reads as follows:

---

[10] "The ultimate issue of obviousness is a legal determination."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

5. The road construction machine of claim 1, wherein:

the switchover device and the one of the indication and setting devices associated with the replacement sensor are operable to ***pre-select the replacement sensor*** and to ***pre-set the operating parameter of the replacement sensor*** prior to effecting the switchover.

As quoted above, claim 5 of the '788 patent adds two limitations to claim 1 of the '788 patent: (1) the ability to "pre-select" a replacement sensor and (ii) the ability to "pre-set" the sensor's operating parameter. *Id.* ¶ 61. However, according to Wirtgen, those additional limitations are insignificant.

22.     In particular, to establish infringement at trial, Wirtgen's expert witnesses (Drs. Rahn and Valerdi) testified that the additional limitations of claim 5 of the '788 patent are met if *at any point prior to the end of a sensor switchover* the system selects or sets a replacement sensor. D.I. 354 (Trial Tr.) at 770:8-19, 773:4-6, 774:12-21, 769:12-14, 782:15-24, 820:7-821:13; Smith Decl. ¶¶ 66-73. In effect, Wirtgen's expert replaced "pre-set" and "pre-select" with "set" and "select." But claim 1 of the '788 patent already includes requirements for "set[ting]" and "select[ing]" a sensor: "indication and setting devices being operable to . . . ***set a set value for the operation parameter*** sensed by it associated sensor" and "switchover from control based upon the first selected subset of selectable sensors to control based upon the second ***selected*** subset of selectable sensors" where "the second selected subset" includes "at least one ***replacement sensor***." *See* claim 1, '788 patent.

## CATERPILLAR'S PROPOSED CONCLUSIONS OF LAW

I.    **WIRTGEN IS JUDICIALLY ESTOPPED FROM TAKING INCONSISTENT POSITIONS ON THE '309 PATENT**

A.    **Legal Standards for Judicial Estoppel**

1.    "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). This rule applies equally to positions taken before an agency (including the patent office). *See Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010); *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, No. 1:17-cv-116, 2020 WL 3317105, at *8 n.15 (N.D. W.Va. June 18, 2020) (applying judicial estoppel to IPR proceedings). The Third Circuit[11] looks at various factors in evaluating judicial estoppel, including whether the party's position is clearly inconsistent with an earlier position, whether the party changing position would obtain an unfair advantage from the change in position, and whether judicial estoppel would be tailored to address the harm. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC.*, 337 F.3d 314, 319 (3d Cir. 2003) (finding judicial estoppel based on omission of potential claim against GM in bankruptcy disclosure form and subsequent pursuit of claim against GM in litigation).

---

[11] In a patent case, the Federal Circuit reviews "questions of judicial estoppel under the law of the regional circuit where the district court sits." *See Akamai Techs. v. Limelight Networks*, 805 F.3d 1368 (Fed. Cir. 2015) ("This court reviews challenges to jury instructions, grants or denials of motions for JMOL, and questions of judicial estoppel under the law of the regional circuit where the district court sits."); *see also Wang Labs., Inc. v. Applied Comp. Scis., Inc.*, 958 F.2d 355, 358 (Fed. Cir. 1992) (applying First Circuit law to issue of judicial estoppel). We assume that Third Circuit law would follow the Supreme Court's guidance in *New Hampshire* concerning the applicability of judicial estoppel. *New Hampshire v. Maine*, 532 U.S. at 749.

**B.      The Patent Office Adopted Wirtgen's Prior Position, and Bad Faith Can Be Inferred**

2.      Given Wirtgen's gamesmanship, judicial estoppel is proper here.      Having successfully advanced one position before the Patent Office, Wirtgen should not now be permitted to change that position in order to obtain an unfair advantage.  This is exactly the kind of bad-faith change of position that the doctrine is designed to prevent.  *See generally Shire Labs, Inc. v. Corepharma, LLC*, No. CIV. A. 06-2266 SRC, 2008 WL 4822186, at *8 (D.N.J. Nov. 3, 2008) ("bad faith" shown because party's change of position would "allow it to gain an advantage unfairly"); *Montrose Med. Grp. v. Bulger*, 243 F.3d 773, 782 (3d Cir. 2001) ("If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled."). Wirtgen's inconsistent position is particularly egregious where Caterpillar was estopped by the same IPR proceeding from challenging the validity of the '309 patent at trial (D.I. 272 at 22-26) – this is in fact what made it possible for Wirtgen to make the new arguments that it otherwise would not have been able to make.  Because Caterpillar was estopped from arguing that Wirtgen's new position would invalidate the '309 patent, Wirtgen was able to adopt an irreconcilably inconsistent position for infringement contrary to its prior validity position.

3.      Numerous courts have held that a party who successfully defends the validity of a patent may not later change its position to win on infringement.  *See, e.g.*, *Trs. of Columbia Univ. in N.Y. v. NortonLifeLock, Inc.*, No. 3:13-CV-808, 2019 WL 7040931, at *5-6 (E.D. Va. Dec. 20, 2019) (where party prevailed on interpretation of term before PTAB, party was precluded from arguing for different interpretation of term at claim construction); *U.S. Ethernet Innovations, LLC v. Tex. Instruments Inc.*, No. 6:11-cv-491, 2014 WL 2740383, at *2-3 (E.D. Tex. June 15, 2014) (barring party who had prevailed at trial on invalidity from taking contradictory infringement

positions). Wirtgen cannot have it both ways—either the four-sided stability pattern is inherent (and the patent is invalid) or it is not inherent (and Caterpillar does not infringe).

### C. Judicial Estoppel Is Tailored to Address the Harm

4.       Finally, with respect to the third factor, applying judicial estoppel is necessary to avoid injustice to Caterpillar, and to decline to apply judicial estoppel would result in a miscarriage of justice. There is nothing unfair about holding Wirtgen to its prior positions advocated before the Patent Office. *See, e.g.*, *Shire Labs.*, 2008 WL 4822186, at *9; *IMEG Corp. v. Patel*, C.A. No. 20-111-CFC, 2021 WL 184407, at *8 (D. Del. Jan. 19, 2021) ("No other sanction can remedy the damage caused by Patel's assertion of contradictory positions."). Wirtgen should thus be judicially estopped from trying to benefit from taking entirely irreconcilable positions.

## II.      THE '530 PATENT IS UNENFORCEABLE DUE TO PROSECUTION LACHES

### A. Legal Standards for Prosecution Laches

5.       "The prosecution laches defense originates from two Supreme Court cases in the early 1900s." *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1360 (Fed. Cir. 2021); *see Woodbridge v. United States*, 263 U.S. 50 (1923) (finding prosecution laches after nine-year delay); *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924) (finding prosecution laches after eight-year delay). A patent is not enforceable "when it has issued only after an unreasonable and unexplained delay in prosecution" based on the totality of the circumstances. *Hyatt*, 998 F.3d at 1360. As the Court explained in *Miller v. Brass Co.*, 104 U.S. 350, 355 (1881), "[i]t will not do for the patentee to wait until other inventors have produced new forms of improvement, and then, with the new light thus acquired, under pretence [*sic*] of inadvertence and mistake, apply for such an enlargement of his claim as to make it embrace these new forms."

6.       Prosecution laches has two elements: "(a) that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances, and (b) that the accused

-14-

infringer suffered prejudice attributable to the delay." *Hyatt*, 998 F.3d at 1362; *Personalized Media Commc'ns, LLC v. Apple Inc.*, 57 F.4th 1346, 1354 (Fed. Cir. 2023).  As to the first, where there is evidence of delay, not just any excuse will do; the patentee must offer a *reasonable* explanation for the delay.  *See Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1153 (N.D. Cal. 2003) (even "the most unreasonable conduct in the prosecution of a patent can be explained in some fashion").  As a matter of law, the patentee's financial self-interests, such as the strategic benefit that a patentee might receive from delaying prosecution, does not constitute a "reasonable" explanation.  *See id.* (finding unreasonable delay for product that had not been "profitably marketable for close to ten years").

7.      As to the second, evidence that "either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay" is sufficient evidence of prejudice.  *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 729 (Fed Cir. 2010).

**B.      Wirtgen's Delay in Prosecuting Broadened Claims for the '530 Patent Was Unreasonable**

8.      Wirtgen's eight-year delay in asserting claims over machines without individually adjustable legs was unreasonable.  "The patent laws require inventors to describe their work in 'full, clear, concise, and exact terms' . . . as part of the delicate balance the law attempts to maintain between inventors, who rely on the promise of the law to bring the invention forth, and the public, which should be encouraged to pursue innovations, creations, and new ideas beyond the inventor's exclusive rights."  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730-31 (2002).  In assessing the reasonableness of the patentee's conduct, courts have considered factors such as whether the patent history was "typical," whether there are any  "unexplained gaps exist in the prosecution history," whether the patentee sought "to limit public awareness of [the] pending applications or the inventions," and whether "any changes in plaintiff's prosecution of the

application coincide with or directly follow evolutions in the field that relate to the claimed invention." *Reiffin*, 270 F. Supp. 2d at 1155.

9.      Here, the prosecution of the '530 Family is far from typical, and the unusual prosecution history led to denying the public any awareness about the full intended scope of Wirtgen's claimed invention.  That denial of knowledge is particularly egregious where Wirtgen was fully aware of Caterpillar's leg design for many years because that design was incorporated into Caterpillar's legacy products.  For nearly a decade, however, Wirtgen made no attempt to cover that design.  Instead, Wirtgen intentionally timed its amendment to the introduction of Caterpillar's next generation of competitive products, which were exactingly monitored and inspected by Wirtgen.  Wirtgen's decision to avoid making such claims until it had a financial motivation to amend the claim amply demonstrates that the amendment was not intended to further innovation, but to gain unfair competitive advantage: Wirtgen kept the full scope of its claims "lurking beneath the surface [to] catch[] competitors off guard."  *Sonos, Inc. v. Google LLC*, No. C 20-06754 WHA, 2023 WL 6542320, at *20 (N.D. Cal. Oct. 6, 2023).

10.      In *Sonos*, during negotiations for a potential collaboration in 2014, Sonos received Google's product design a year before Google launched its product in 2015.  Yet, after filing a provisional application in 2006, Sonos "did not file the applications for these patents and present the asserted claims for examination until 2019."  Once the new patent (which ostensibly descended from the 2006 application) issued, Sonos claimed a priority date predating Google's disclosures and launch.  Google's intervening product then fell under a cloud of infringement.  *See id.* at *1. Here, similar to the patentee in *Sonos*, Wirtgen maintained narrower claims in the '530 Family for nearly a decade and "let the industry develop," only to belatedly expand the scope of its claims to cover a competitor's intervening product.  *See id.* at *20.

11.     Indeed, Wirtgen's belated enlargement of its claims is precisely the type of "changes in [] prosecution of the application" designed to "coincide with or directly follow evolutions in the field that relate to the claimed invention," and warranting prosecution laches. *Reiffin*, 281 F. Supp. 2d at 1155.  The timing of this amendment is not coincidental; it took place nine days after Wirtgen obtained a PM622 in Germany.  When asked, Wirtgen's outside patent prosecution counsel had no explanation for why the claims of the '530 patent could not have been presented years earlier.  *See* Ex. 18 (Montle Dep.) at 34:5-12 ("Q. And focusing on Claim 1 of the '530 Patent, are you aware of any reason why Wirtgen could not have presented Claim 1 of the '530 Patent in one of the two earlier continuations?  A. I'm not aware.").  As such, it is clear that the enlargement was tactically motivated to target Caterpillar's new machines.

### C.    Caterpillar Suffered Prejudice Attributable to Wirtgen's Delay

12.     Prejudice is presumed when there is an egregious delay, *i.e.*, over six years, and new purportedly infringing products are introduced.  *See Hyatt*, 998 F.3d at 1370 ("an unreasonable and unexplained prosecution delay of six years or more raises a presumption of prejudice, including intervening rights.").  As such, to establish prejudice, all Caterpillar must show is that it "invested in, worked on, or used the claimed technology during the period of delay."  *Id.* at 1362. It is beyond dispute that Caterpillar meets this test.  Caterpillar invested millions of dollars (and hundreds of thousands of person hours) in its PM600 and PM800 cold planer series, commercially launched its PM600 products, and began final customer validation of its PM800 between the filing of the first patent in the family and the date on which Wirtgen first made its new claims.  *See* Engelmann Decl. ¶¶ 6-7.  By broadening claims only after Caterpillar developed and launched its intervening products in the PM600 series, Wirtgen denied Caterpillar the opportunity to implement design arounds earlier, like the one that was ultimately implemented after the ITC investigation.

*See, e.g.*, Ex. 19 (05/19/21 CBP Ruling Letter) at 29, 31 (determining that updated Caterpillar machines did not infringe claims 2, 5, 16, and 23 of '530 patent).

13.     Accordingly, the Court finds that Caterpillar developed intervening rights and was prejudiced by Wirtgen's delay in prosecuting the '530 patent, and the '530 patent is unenforceable against Caterpillar.

## III.   THE '268 PATENT IS UNENFORCEABLE AGAINST CATERPILLAR BECAUSE OF EQUITABLE INTERVENING RIGHTS

### A.   Legal Standards for Equitable Intervening Rights

14.     The doctrine of intervening rights is codified in 35 U.S.C. § 252: "A reissued patent shall not abridge or affect the right of any person . . . who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent."  The "purpose of the statute is to protect investments which have been made in good faith reliance on some perceived infirmity in the original patent."  *See John Bean Techs. Corp. v. Morris & Assocs., Inc.*, No. 4:14-CV-00368-BRW, 2019 WL 7176779, at *1 (E.D. Ark. Sept. 23, 2019) ("*John Bean I*"), *aff'd*, 988 F.3d 1334 (Fed. Cir. 2021) ("*John Bean II*").  Under the doctrine, an alleged infringer maintains the "right to use what is not specifically claimed in the original patent."  *John Bean II*, 988 F.3d at 1338; *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1334 (Fed. Cir. 2019).

15.     Equitable intervening rights arise when (1) the reissue claims do not have identical scope to the original claims; and (2) equity favors application of the doctrine.  *See John Bean I,*

2019 WL 7176779, at *1; *see also John Bean II*, 988 F.3d at 1338 ("an infringer may continue to infringe after reissue . . . if the court decides that equity dictates such a result").

> **B.   Caterpillar Launched New Products in Good Faith and Has Intervening Rights**

16.   There is no dispute that the first element for application of intervening rights (lack of identicality) is met – Wirtgen admits (*see id.*) that the reissued claim 14 (on which asserted claim 32 depends) "do[es] not have identical scope to the original claim." *See John Bean II*, 988 F.3d at 1338; *see also Eberle v. Harris*, No. 03-cv-5809 (FLW), 2010 WL 6281563, at *6 (D.N.J. June 30, 2010) ("The scope of the claim is substantively changed where[] the amended claim is narrower in scope than the original claim.").

17.   As to the second element, in assessing the equities, courts consider a variety of factors, such as the good or bad faith exercised by the parties; years and expense of research, development, and investment in preparing for commercialization; and the degree to which the accused infringer has recovered its investment. *See John Bean II*, 988 F.3d at 1341.  These equities favor applying equitable intervening rights against the '268 patent. *See* Engelmann Decl. ¶¶ 5-8.

18.   For its part, Caterpillar developed the accused products in good faith. *See* Engelmann Decl. ¶¶ 2-8.  When Caterpillar launched the PM600 and PM800 machines in 2016 and 2017, the '268 Patent, issued in 2020, did not exist. *See id.*  Caterpillar invested tens of million dollars and hundreds of thousands of engineering hours bringing both product lines to market and had no reason to believe that Wirtgen had any rights to the underlying invention. *See id.*  Caterpillar's understanding was confirmed when Wirtgen's related claim 1 of the EP '004 patent was invalidated over Caterpillar's PM565 machines, forcing Wirtgen to return to the Patent Office to save the U.S. version of that patent (the '659 Patent). *See* Klopp Decl. ¶¶ 8-15, Table 1.  Indeed, "the conclusion of the Italian court regarding Claim 1 of the EP '004 Patent—that it was invalid

as anticipated by the PM-565—would apply equally to Claim 14 of the '659 Patent, rendering it invalid." *Id.* at ¶ 16.

19.     In contrast to Caterpillar's good faith, Wirtgen used the opportunity to obtain an amended set of claims, which it then used to newly assert infringement against the PM600 and PM800 series despite both product lines ***predating*** the '268 Patent by many years. *See* Engelmann Decl. ¶¶ 5, 7. The doctrine of intervening rights is intended to protect defendants from precisely this sort of predatory use of the patent system.

20.     Accordingly, this Court finds that the '268 patent is unenforceable against Caterpillar and permits Caterpillar to continue selling the PM600 and PM800 series machines, at least through recoupment of its investment. *Id*. ¶¶ 5-8.[12]

## IV. COLLATERAL ESTOPPEL BARS WIRTGEN FROM ASSERTING CLAIM 5 OF THE '788 PATENT

### A. Legal Standards for Collateral Estoppel

21.     "Under Third Circuit law, collateral estoppel applies when: (1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Biogen Int'l GmbH v. Amneal Pharms. LLC*, 487 F. Supp.

---

[12] Absolute intervening rights would further limit any attempted recovery on alleged infringement of the '268 patent. Wirtgen is not seeking pre-issuance damages for the '268 patent. *See* Ex. 22 (05/19/23 Seth Opening) at ¶ 312. If it were, Caterpillar's absolute intervening rights would bar Wirtgen from doing so. *See BIC Leisure Prod. v. Windsurfing Int'l*, 1 F.3d 1214, 1220, 1221 (Fed. Cir. 1993) (absolute intervening rights "provide an accused infringer with the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent" – "[i]n other words, it covers products already made at the time of reissue"). The doctrine applies, absolutely, so long as the original and reissued claims are not substantially identical. *See id.* at 1221; *Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1305 (Fed. Cir. 2008). Here, the original claim 14 of the '659 patent is not substantially identical to claim 14 of the '268 patent, as the '268 patent was admittedly narrowed in light of invalidating prior art – the PM565 machine.

3d 254, 258 (D. Del. 2020). Here, there should no dispute as to the second, third, and fourth elements of the test. The Patent Office issued a final decision that claim 1 of the '395 patent was invalid; that finding of invalidity was essential to the outcome of the IPR proceedings; and Wirtgen had a full and fair opportunity to litigate that issue in the IPR.

22. The first element is also met. A patentee does not avoid collateral estoppel merely by asserting a nominally different patent claim than one previously invalidated. *See Ohio Willow Wood Co. v. Alps South.*, LLC, 735 F.3d 1333, 1342 (Fed. Cir. 2013) (holding that collateral estoppel barred enforcement of patent claims that were "substantially similar" to other invalidated patent claims). The patent claims need not be identical, so long as the differences between the previously invalidated claim and the claim asserted in litigation do not differ in ways that "materially alter the question of invalidity." *Id.* Thus, where the only difference between the claim at issue and the previously invalidated claim is an obvious limitation, such difference does not materially alter the question of patentability. *See Google LLC v. Hammond Dev. Int'l, Inc.*, 54 F.4th 1377, 1381-82 (Fed. Cir. 2022) (preclusion applies where when asserted patent claim presents the same issues of invalidity as previously invalidated claim).[13]

**B. Claim 5 of the '788 Patent Adds Only Obvious, Legally Immaterial Limitations to Claim 1 of the '788 Patent**

23. Since Wirtgen's infringement theory equates "pre-set" with "set" and pre-select" with "select," claim 1 of the '788 patent and claim 5 of the '788 patent are materially indistinguishable from one another. *See* Smith Decl. ¶¶ 60-65. Further, as discussed above, because claim 1 of the '788 patent is legally identical to invalidated claim 1 of the '395 patent,

---

[13] Federal Circuit law applies to this species of collateral estoppel. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,* 672 F.3d 1335, 1341 n.1 (Fed. Cir. 2012).

claim 5 of the '788 patent raises the same patentability issues as claim 1 of the '395 patent, and collateral estoppel applies.  *See id.* at ¶ 73; *see also Ohio Willow Wood*, 735 F.3d at 1342-43.[14]

24.    Because all elements of collateral estoppel are met, Wirtgen is precluded from asserting claim 5 of the '788 patent against Caterpillar.

## V.    CONCLUSION

For all the foregoing reasons, this Court finds that the '309, '530, '268, and '788 patents are unenforceable against Caterpillar.

---

[14] During IPR proceedings on the '395 patent, the Patent Office found claim 5 of the '395 patent to be patentable.  However, unlike claim 1 of the '395 patent, claim 5 of the '395 patent is legally distinct from claim 5 of the '788 patent.  Specifically, claim 5 of the '395 patent requires that "the controller and switchover system includes a ***manually*** operable switchover device" where "a human operator may ***manually*** pre-select the replacement sensor and ***manually*** pre-set the operating parameter . . . ."  Wirtgen successfully argued that Caterpillar failed to prove that this "manual" embodiment was obvious.  Critically, this "manual" limitation, which saved claim 5 of the '395 patent, is absent from claim 5 of the '788 patent.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ Bindu A. Palapura*
      Bindu A. Palapura (#5370)
      Andrew L. Brown (#6766)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      bpalapura@potteranderson.com
      abrown@potteranderson.com

James C. Yoon
Ryan R. Smith
Christopher D. Mays
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 493-9300

*Attorneys for Defendant Caterpillar Inc.*

Lucy Yen
Cassie Leigh Black
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel: (212) 999-5800

Matthew A. Macdonald
Neil N. Desai
Naoya Son
Alex J. Turner
WILSON SONSINI GOODRICH & ROSATI, P.C.
953 E. 3rd St., #100
Los Angeles, California 90013
Tel: (323) 210-2900

Dated:  April 12, 2024
11445393/11898.00005