# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WIRTGEN AMERICA, INC. | |
| *Plaintiff/Counterclaim-Defendant,* v. | Case No. 17-770-JDW |
| CATERPILLAR INC. | |
| *Defendant/Counterclaim Plaintiff.* | |

## PLAINTIFF'S CORRECTED OPENING BRIEF IN SUPPORT OF MOTIONS FOR ENHANCED DAMAGES, ATTORNEYS' FEES, INJUNCTION OR ONGOING ROYALTIES, AND OTHER RELIEF

Dated: May 1, 2024

OF COUNSEL:

Ryan D. Levy
Seth R. Ogden
William E. Sekyi
Mark A. Kilgore
PATTERSON INTELLECTUAL
PROPERTY LAW, P.C.
1600 Division Street, Suite 500
Nashville, Tennessee 37203
(615) 242-2400
*rdl@iplawgroup.com*
*sro@iplawgroup.com*
*wes@iplawgroup.com*
*mak@iplawgroup.com*

    - and -

Daniel E. Yonan
Paul A. Ainsworth
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
*dyonan@sternekessler.com*
*painsworth@sternekessler.com*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Adam W. Poff (No. 3990)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
*apoff@ycst.com*
*swilson@ycst.com*

*Attorneys for Plaintiff Wirtgen America, Inc.*

# TABLE OF CONTENTS

I.    The Court should award Wirtgen enhanced damages...........................................................2

    A.    Caterpillar directly copied Wirtgen's inventions (*Read Factor* 1). .......................3

    B.    Caterpillar had no good-faith belief that the asserted claims were invalid or
not infringed (*Read* Factor 2)..................................................................................5

    C.    Caterpillar's litigation behavior and its assertion of meritless arguments
support enhancing damages (*Read* Factors 3 and 5)...............................................7

    D.    Caterpillar's size supports enhancing damages (*Read* Factor 4). ..........................9

    E.    The duration of Caterpillar's infringement supports enhancing damages
(*Read* Factor 6). ....................................................................................................9

    F.    The lack of remedial actions taken by Caterpillar supports enhancing
damages (*Read* Factor 7). .....................................................................................10

    G.    Caterpillar was motivated to undercut Wirtgen in the cold planer machine
industry to gain market share (*Read* Factor 8)....................................................12

II.    This case is exceptional, justifying an award of Wirtgen's reasonable attorneys' fees....14

III.    The Court should enjoin Caterpillar's infringement............................................................15

    A.    Wirtgen will be irreparably harmed absent an injunction because it directly
competes with Caterpillar in the cold planer machine and rotary mixer
markets (*eBay Factor* 1). .....................................................................................16

    B.    Damages cannot compensate for the future harm Caterpillar's continued
infringement will cause (*eBay Factor* 2). .............................................................18

    C.    The balance of hardships favors an injunction (*eBay Factor* 3). ..........................20

    D.    An injunction furthers the public interest (*eBay Factor* 4)...................................21

IV.    Should it deny injunctive relief, the Court should award an ongoing royalty. .................21

V.    Supplemental damages and prejudgment and post-judgment interest are warranted
for Wirtgen as the prevailing party. ..................................................................................23

VI.    Conclusion ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acumed LLC v. Stryker Corp.*,
  551 F.3d 1323 (Fed. Cir. 2008)..................................................................................19

*Allen Archery, Inc. v. Browning Mfg. Co.*,
  898 F.2d 787 (Fed. Cir. 1990)....................................................................................24

*Amado v. Microsoft Corp.*,
  517 F.3d 1353 (Fed. Cir. 2008)..................................................................................22

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013)..................................................................................16

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015)..........................................................................16, 19, 21

*Applera Corp. v. MJ Rsch. Inc.*,
  372 F. Supp. 2d 233 (D. Conn. 2005).........................................................................12

*ArcherDX, LLC v. Qiagen Scis., LLC*,
  C.A. No. 18-1019, 2022 WL 4597877 (D. Del. Sept. 30, 2022).........................................9, 24

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
  No. 14-cv-62369, 2017 WL 7732873 (S.D. Fla. Jan. 3, 2017),
  *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017).......................................................................23

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
  670 F.3d 1171 (Fed. Cir. 2012)..................................................................................14

*Bayer Healthcare LLC v. Baxalta Inc.*,
  No. 16-cv-1122, 2019 WL 4016235 (D. Del. Aug. 26, 2019).........................................15, 24

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008)....................................................................................21

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013)..................................................................................18

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
  522 F. Supp. 3d 40 (D.N.J. 2021)..............................................................................13

*Eaves v. Cnty. of Cape May*,
  239 F.3d 527 (3d Cir. 2001)......................................................................................25

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)......................................................................................15, 18

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
   697 F.3d 1342 (Fed. Cir. 2012)....................................................................24

*Gen. Motors. Corp. v. Devex Corp.*,
   461 U.S. 648 (1983)......................................................................................24

*Georgetown Rail Equip. Co. v. Holland L.P.*,
   867 F.3d 1229 (Fed. Cir. 2017)......................................................................3

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
   C.A. No. 15-634, 2019 WL 1877189 (D. Del.) ...........................................24

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. 93 (2016)..........................................................................................3

*Hologic, Inc. v. Minerva Surgical, Inc.*,
   957 F.3d 1256 (Fed. Cir. 2020)....................................................................25

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)......................................................................18

*Mass Engineered Design, Inc. v. Ergotron, Inc.*,
   633 F. Supp. 2d 361 (E.D. Tex. 2009)..........................................................21

*Metalcraft of Mayville, Inc. v. The Toro Company*,
   848 F.3d 1358 (Fed. Cir. 2017)....................................................................21

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
   313 F. Supp. 2d 361 (D. Del. 2004),
   *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006)......................................................9, 13

*Novozymes A/S v. Genencor Int'l, Inc.*,
   474 F. Supp. 2d 592 (D. Del. 2007)..............................................................12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014)......................................................................................14

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007)....................................................................22

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)....................................................................23

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012)....................................................................16

*Purewick Corp. v. Sage Prods., LLC*,
666 F. Supp. 3d 419 (D. Del. 2023)................................................................................24

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992)...........................................................3, 5, 7, 9, 11, 12

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)...............................................................................15, 20

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
707 F. Supp. 2d 737 (N.D. Ohio 2010)........................................................................14

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*,
821 F. Supp. 2d 681 (D.N.J. 2011)...............................................................................19

*Shire Viropharma Inc. v. CSL Behring LLC*,
C.A. No. 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021)...................................8

*Spectralytics, Inc. v. Cordis Corp.*,
649 F.3d 1336 (Fed. Cir. 2011).......................................................................................6

*St. Clair Intell. Prop. Consultants, Inc. v. Fuji Photo Film Co., Ltd.*,
674 F. Supp. 2d 555 (D. Del. 2009)..............................................................................25

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
C.A. No. 04-876, 2014 WL 1457797 (D. Del. Apr. 14, 2014)..................................22

*Vanda Pharms. Inc. v. Roxane Labs., Inc.*,
C.A. No. 13-1973, 2016 WL 4490701 (D. Del. Aug. 25, 2016) .............................21

*WBIP, LLC v. Kohler Co.*,
C.A. No. 11-10374, 2014 WL 585854 (D. Mass. Feb. 12, 2014), *aff'd*, 829
F.3d 1317, 1339–42 (Fed. Cir. 2016)............................................................................3

*WhitServe, LLC v. Comput. Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)........................................................................................23

*Wonderland Switzerland AG v. Evenflo Co.*,
No. 1:20-cv-00727, 2023 WL 4098571 (D. Del. June 7, 2023) ........................16, 20

*Wonderland Switzerland AG v. Evenflo Co.*,
No. 1:20-cv-00727, 2023 WL 5497918 (D. Del. July 24, 2023).................................24

**Statutes**

28 U.S.C. § 1961 ............................................................................................................25

35 U.S.C. § 284...........................................................................................................3, 23

35 U.S.C. § 285 ......................................................................................................14, 15

35 U.S.C. § 298 ..............................................................................................................6

**Other Authorities**

Federal Rule of Civil Procedure 54(d) .........................................................................15

Seaman, C., *Permanent Injunctions in Patent Litigation After eBay: An Empirical
  Study*, 101 Iowa L. Rev. 1949, 1969, 1990 (2016) ..................................................15

This case involves a pattern of willful patent infringement that is—literally—without precedent. Caterpillar knew that Wirtgen had multiple patents on its cold planer machines. But, rather than use that knowledge to avoid infringing, Caterpillar—frustrated with its abysmal performance in the cold-planer machine market—set out to systematically analyze and copy the patented features of Wirtgen's market-leading machines.

Wirtgen promptly tried to stop Caterpillar's infringement. In 2017, it brought an action before the U.S. International Trade Commission ("ITC") to protect its rights, and the ITC confirmed that Wirtgen's patents were valid and that Caterpillar infringed them. Yet Caterpillar *still* did not stop infringing—not after an ITC ALJ found in Wirtgen's favor; not after the ITC affirmed; and not even after the ITC issued an exclusion order prohibiting Caterpillar from importing its infringing machines. Instead, Caterpillar *moved its overseas manufacturing to the United States* so it could continue infringing domestically and deliberately circumvent the ITC's remedy. It took Caterpillar years to finally redesign its machines, even then, it redesigned around only some of the patents. In the meantime, it continued selling infringing machines.

So Wirtgen had to take further actions to protect its rights. After the ITC proceeding, Caterpillar's infringement continued and Wirtgen pursued its legal remedies in this Court to bring an end to Caterpillar's conduct. The trial revealed the same story. Indeed, Caterpillar made little effort to dispute any of its bad acts. It largely acknowledged copying, attempting instead to excuse it as routine industry practice. And it never presented a shred of evidence that it had a good-faith belief that Wirtgen's patents were invalid or not infringed.

Given Caterpillar's disregard of Wirtgen's patent rights, it is not surprising that the jury found that Caterpillar willfully infringed five Wirtgen patents (some of those that were before the ITC and others that were not). The same circumstances that led to that verdict counsel in favor of

this Court enhancing damages and awarding attorneys' fees.

Indeed, Wirtgen submits that these unique facts compel enhancement. Wirtgen is unaware of any case where a party circumvented an exclusion order in the way Caterpillar did here. But Caterpillar's motivation for its particularly brazen infringement is no mystery: Between October 2018 and the end of 2023, Caterpillar turned a *profit* of more than $96 million. This is despite its assertions at trial that it had "easy" design-around options. In short, Caterpillar decided to place its own profits over Wirtgen's patent rights—to take Wirtgen's market share at any cost. That is precisely the sort of behavior enhancement is designed to deter.

The damage has been done. Wirtgen has suffered infringement for years despite having never licensed its patents in the past to any competitor, let alone Caterpillar. Indeed, every single cold planer machine Caterpillar has sold since 2017 has been found to infringe at least one Wirtgen patent. Enhancement and attorneys' fees are warranted to send a message that this sort of behavior cannot be tolerated. Wirtgen also respectfully requests that the Court (i) enjoin the sale of Caterpillar's infringing cold planer machines or, alternatively, impose an ongoing royalty 2–3 times the implied royalty awarded by the jury; (ii) award prejudgment and post-judgment interest; and (iii) award supplemental damages for pre-verdict sales not presented to the jury.

## I.     The Court should award Wirtgen enhanced damages.

The jury awarded $12.9 million for Caterpillar's infringement of five patents. The jury also found the infringement willful. Substantial evidence supported this finding. Indeed, this case involves more than the typical proof of willful infringement. Caterpillar continued to make and sell infringing machines even after the ITC ALJ found its machines infringed the '530, '309, and '641 patents. Even worse, Caterpillar made a calculated decision to move its manufacturing to the United States to continue making and selling infringing machines and evade the ITC's exclusion order. In view of Caterpillar's defiant and continuing willful infringement, Wirtgen

respectfully requests that the Court treble the awarded damages to punish Caterpillar's behavior. *See* 35 U.S.C. § 284; *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 107 (2016).

Courts typically apply the nine *Read* factors to guide the enhancement analysis: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer investigated the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). However, courts need not discuss every factor, as they are non-exclusive. *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244–45 (Fed. Cir. 2017).

As shown below, the "particular circumstances" of this case merit treble damages.

### A.      Caterpillar directly copied Wirtgen's inventions (*Read Factor* 1).

Direct copying of a patented invention, as happened here, strongly supports enhanced damages. *See WBIP, LLC v. Kohler Co.*, C.A. No. 11-10374, 2014 WL 585854, at \*7 (D. Mass. Feb. 12, 2014), *aff'd*, 829 F.3d 1317, 1339–42 (Fed. Cir. 2016). This is not a case where a defendant simply knew about the patents and kept selling machines that were later determined to infringe. Caterpillar acknowledged the deficiencies in its own machines, observed the success of Wirtgen's machines, and so systematically tore them down and copied them. That conduct is particularly egregious and justifies trebling the jury's damages award. *Halo*, 579 U.S. at 106.

Before Caterpillar copied Wirtgen's machines, its legacy machines had a problem: they were outdated. Trial Transcript ("Tr.") 1798:17–1799:1; *see* Tr. 1856:14–19. In fact, Caterpillar readily acknowledged that it had "limped" in the cold planer space because it had not updated its machines for years. Tr. 360:18–361:2. But, instead of coming up with its own innovative

designs, Caterpillar sought a shortcut by taking Wirtgen's functions and features and using them

as a benchmark Tr. 413:12–414:10; Tr. 429:12–17; Ex. 0611.0039.

Caterpillar acquired two Wirtgen machines and identified the features it wanted in

include in what would become Caterpillar's PM300, PM600, and PM800 series machines.

Caterpillar tested Wirtgen's machines, systematically broke them down, photographed and

created 3D CAD models of their components, and reassembled them. Tr. 406:8–19, 408:6–11,

408:24–409:17, 409:19–410:20; *see also* Tr. 496:22, 497:8–12, 497:17–21; Ex. 0562.0041.

Caterpillar combed through the data that it had collected from its tests. Tr. 562:21–

564:11; Ex. 1344.0003. And it identified several advanced technologies, which it categorized as

"catch-up" features and "value match" features from Wirtgen's machines that it wanted to copy

and include in its own machines. Tr. 415:22–416:1; *see also* Tr. 418:6–420:16, 420:18–421:5,

421:15–424:6, 427:1–7, 429:3–431:17.

For example, Caterpillar made the following assessments:

- The "Four-Fold Floating Axle" patented in the '309 patent was categorized as a "Catch Up" feature, as of 2011. Ex. 0602.0107. Caterpillar recognized that the "PM200 has no active suspension system," but the "W210 has a 'Four-Fold Floating Axle' suspension system." Ex. 0604.0005. By 2017, Caterpillar named this feature its "Ride Control System," and categorized it as a "Value Match" feature. Ex. 0611.0039.

- The "Position Sensing Cylinders" patented in the '530 patent was categorized as a "Value Match" feature. Ex. 0611.0039.

- The "Parallel to Surface Auto Leveling Technology" patented in the '972 patent was categorized as a "Catch Up" feature, as of 2011. Ex. 0602.0107. Caterpillar recognized that the "PM200 does not have a Parallel to Surface feature," but the "W210 has a feature that automatically adjusts the rear legs while entering a cut and continuing in the cut to keep the machine parallel to the cutting surface." Ex. 0604.0003. By 2017, Caterpillar described this feature as "Automatic Four Leg Leveling," and categorized it as a "Value Match" feature. Ex. 0611.0039.

- The "Infinite reverse with rotor running (using new sensors)" patented in the '641 patent was categorized as a "Differentiation" feature. Ex. 0602.0107. Caterpillar observed that the Wirtgen "[m]achine is able to reverse indefinitely as long as the status of the sensor is within the desired range – need to determine exactly what this sensor is, Wirtgen use

4

moldboard position"). Ex. 0227A.0021; *see also* Tr. 424:7–13, 425:12–426:24.

- The "Intuitive Grade & Slope Display" patented in the '788 patent was categorized as a "Superior" feature. Ex. 0611.0039; *see* Tr. 431:8–432:17 (Mr. Engelmann explaining that this feature refers to the hot swap feature).

While gathering competitive intelligence may be common within the cold planer industry, Caterpillar's systematic teardowns were *not* standard industry practice. Caterpillar's engineering manager Dario Sansone testified that, although he had worked in the industry since 1992 and designed other cold planer machines, he did not participate in the teardown of a competitor's machine until he worked for Caterpillar. Tr. 1076:16–23. Indeed, Caterpillar's teardowns specifically targeted Wirtgen's machines. It did not tear down any other cold planer competitor's machine. Tr. 1799:8–17. And the result of Caterpillar's comprehensive teardowns were machines with identical functionality to Wirtgen's machines. *See* Tr. 638:10–640:3; Ex. 1344.0006 (noting that Caterpillar could not accomplish Wirtgen's patented four-way floating axle arrangement "without having the exact same plumbing arrangement that the W210 has (i.e. if we have a valve to control each leg individually, we will not accomplish this feature)").

Moreover, there is no evidence that Caterpillar tried to avoid including Wirtgen's patented features in its new machines. On the contrary, the fact that the very engineers who tore down Wirtgen's machines, including Mr. Engelmann and Mr. Steffen, were the same engineers who designed Caterpillar's machines undermines any argument that Caterpillar independently developed its machines or that the similarities between Caterpillar and Wirtgen's machines were mere coincidence. Caterpillar's brazen copying strongly favors enhancing the jury's award.

**B.     Caterpillar had no good-faith belief that the asserted claims were invalid or not infringed (*Read* Factor 2).**

Caterpillar knew of Wirtgen's asserted patents as early as 2013. *See* Tr. 364:14–365:2. This was by design; four different Caterpillar witnesses testified that Caterpillar monitored all of

Wirtgen's patents and patent applications even before it started implementing those same features on its PM300, PM600, and PM800 series machines. Tr. 432:22–433:17 (Engelmann), 434:3–435:2 (Engelmann), 555:9–16 (Engelmann), 564:18–565:8 (Steffen), 565:18–21 (Steffen), 668:10–17 (Killion), 1076:24–1077:1 (Sansone). Indeed, other than Wirtgen's '530 patent, the infringed patents all issued before the Gateway 2 phase of Caterpillar's cold planer program—the phase where Caterpillar finalized the concepts for its machines. Tr. 435:4–437:23, 437:25–438:19. *Cf.* Ex. 0001; Ex. 0003; Ex. 0004; Ex. 0005.

Despite Caterpillar's knowledge of Wirtgen's patents, it did not investigate the scope of the patents and form a good-faith belief that they were invalid or not infringed. Caterpillar purports to have an internal policy to respect the intellectual property rights of others. Tr. 556:10–13. But it presented *no evidence* of any investigation of Wirtgen's patents to assess infringement risks or validity, instead withholding such materials as privileged.

That was Caterpillar's right, but the decision comes at a cost. While Caterpillar's lack of an opinion of counsel would have been inadmissible to show willful infringement in the first instance, *see* 35 U.S.C. § 298, the Court may consider the lack of an adequate investigate when determining whether to enhance damages. *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011). Moreover, even if one were to presume Caterpillar—at some point—held a good-faith belief that Wirtgen's patents were invalid or not infringed, the ITC's determination would have disabused Caterpillar of it. The ITC found Caterpillar to infringe the '309, '530, and '641 patents. Tr. 237:9–14. But Caterpillar continued to infringe and indeed moved its manufacturing to the United States to avoid the ITC's exclusion order. Tr. 441:3–442:21; *see also* Tr. 219:20–21, 219:25–220:20, 438:21–442:21, 556:10–557:1.

Caterpillar didn't stop there. After the ITC finding, Caterpillar released *new* cold planer

builds for the PM300, PM600, and PM800 series machines using the same infringing technology. Tr. 369:3–15, 370:13–371:23, 372:5–373:25, 375:1–11, 375:13–376:22, 377:1–10, 381:13–16, 381:22–382:1. Even just last year—in 2023—Caterpillar released the infringing RM600 and RM800 rotary mixer machines that use the same sensing technology in its leg cylinders that both the ITC and the jury here found infringe Wirtgen's patents. Tr. 451:15–452:7.

In short, Caterpillar presented no evidence of any good-faith belief that Wirtgen's patents were invalid or not infringed, and when faced with the ITC's findings of infringement, Caterpillar flouted those determinations and implemented the infringing features on new builds and new machines. *Read* factor 2 also favors enhancing the jury's award.

### C.    Caterpillar's litigation behavior and its assertion of meritless arguments support enhancing damages (*Read* Factors 3 and 5).

Caterpillar litigated this case unreasonably, needlessly multiplying the proceedings by maintaining factually and legally meritless arguments. Three examples illustrate the point.

*First*, after Wirtgen moved for summary judgment of infringement of claims 5 and 22 of the '530 patent and claim 29 of the '309 patent (three claims that the ITC found infringed), Caterpillar opposed, citing its experts' opinions that (i) the Caterpillar machines did not have a lifting sensor with two points of attachment to the lifting column (relevant to infringement of the '530 patent), *see* D.I. 239 at 5; (ii) the magnet in the Caterpillar machines is not part of the lifting sensor (also relevant to infringement of the '530 patent), *see id.* at 6; and (iii) Wirtgen had not established that the Caterpillar machines have a four-sided stability pattern in the location required by the '309 patent, *see id.* at 10–11. At trial, however, Caterpillar's experts dropped all non-infringement arguments regarding these patents, *see* Tr. 1732:16–19—likely because they were weak to the point of being frivolous. Caterpillar should not have opposed summary judgment based on expert opinions it had no intention of offering at trial.

*Second*, Caterpillar accused Wirtgen of infringing a patent on a water-spray system that requires a road-construction machine with "a water reservoir mounted on the frame and configured to enclose water." D.I. 272 at 16. But the machines Caterpillar accused do not have a water tank mounted on the machine frame: "Wirtgen's water reservoir is made from a void in the frame, so the reservoir isn't mounted on the frame; it's part of the frame." *Id.* at 17. It appears Caterpillar knew this. Its expert Dr. Sorini candidly admitted at his deposition that he had no opinions about how the tank was mounted. Dr. Sorini maintained his infringement opinion only by relying on a facially implausible construction of "mounted on" to mean simply "at the top of." D.I. 272 at 16. As the Court observed in granting Wirtgen's motion for summary judgment of non-infringement, that construction reads the word "mounted" out of the claim altogether. *Id.*

*Third*, Caterpillar wasted both the Court's and Wirtgen's time by improperly proffering so-called "expert" testimony on willfulness from a lawyer named Paul Bartowski. D.I. 283 at 4–5. As the Court held, those opinions were inadmissible. Expert testimony on the law is useless—judges decide what the law is, not expert witnesses—and experts cannot properly testify about "a party's subjective state of mind." *Id.* at 5; *see, e.g.*, *Shire Viropharma Inc. v. CSL Behring LLC*, C.A. No. 17-414, 2021 WL 1227097, at *5 (D. Del. Mar. 31, 2021)  Caterpillar's pattern of vexatious litigation conduct further supports enhancement.[1]

---

[1] Caterpillar also brought a "retaliatory" ITC investigation against Wirtgen and accused it of infringing three patents of its own. 337-TA-1088. All of the Caterpillar patents asserted, however, were found to be not infringed or invalid.

**D.     Caterpillar's size supports enhancing damages (*Read* Factor 4).**

Caterpillar is a multinational corporation with vast financial means. Caterpillar brings in

billions of dollars in revenue and profits each year. Indeed, the jury's damages award represents

a mere fraction of a percent of Caterpillar's 2022 construction industry revenue. Caterpillar "will

not be materially impacted by an award of enhanced damages," which weighs in favor of

enhancement. *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 390 (D. Del. 2004),

*aff'd*, 436 F.3d 1317 (Fed. Cir. 2006); *see ArcherDX, LLC v. Qiagen Scis., LLC*, C.A. No. 18-

1019, 2022 WL 4597877, at *17 (D. Del. Sept. 30, 2022) (finding this factor to favor

enhancement when "[t]rebling the jury's award [resulted in a figure] less than 0.1% of

[defendant's] 2020 net sales of $1.87 billion.").

**E.     The duration of Caterpillar's infringement supports enhancing damages
         (*Read* Factor 6).**

Caterpillar has infringed Wirtgen's asserted patents for years. Caterpillar launched the

first infringing machine in 2016. After careful review of that machine, Wirtgen notified

Caterpillar of its infringement in June 2017 and requested that Caterpillar remove the infringing

features. *See* Tr. 225:18–226:10. But Caterpillar made a calculated decision not to do so. Tr.

438:21–442:21. As explained above, it refused to stop infringing when Wirtgen requested it in

June 2017, and it refused again after the ITC proceedings. Indeed, Caterpillar did not stop selling

the *exact* machines the ITC found infringing for *years* after the ITC decision. Tr. 899:8–12.

Worse yet, as noted above, not only did Caterpillar continue to sell infringing machines,

Caterpillar launched numerous new builds of those machines that maintained a variety of

infringing features, including the recent launch of the infringing RM600 and RM800 rotary

mixers with certain infringing features just last year. A list of Caterpillar's machine changes and

new build introductions post-ITC initial determination by the ALJ on October 1, 2018, is

provided below. This table demonstrates that, despite certain redesigns, Caterpillar continued to

release infringing machines even after the ITC's 2018 infringement findings:

| Machine | Build | Release Date | Citation | Patents Infringed |
|---|---|---|---|---|
| Large Cold Planer Machines (PM600 / PM800) | 02A | 2019 | Tr. 372:5–20 | '309, '530, '641, '788, '972 |
| Large Cold Planer Machines (PM600 / PM800) | Ride Control Removed Mid-02A | 2020 | Tr. 373:18–375:11 | '530, '641, '788, '972 |
| Large Cold Planer Machines (PM600 / PM800) | 02B | 2020 | Tr. 372:23–373:17 | '641, '788, '972 |
| Large Cold Planer Machines (PM600 / PM800) | Reverse Rotor Shutoff V1 Removed | 2021 | Tr. 375:13–17 | '788, '972 |
| Small Cold Planer Machines (PM300) | 02A | 2019 | Tr. 376:12–17 | '641, '788 |
| Small Cold Planer Machines (PM300) | 02B | 2019 | Tr. 376:12–17 | '641, '788 |
| Small Cold Planer Machines (PM300) | Reverse Rotor Shutoff V1 Removed | 2021 | Tr. 376:18–22 | '788 |
| Rotary Mixers (RM600 / RM800) | / | 2023 | Tr. 377:1–10 | '530 |

As set forth in the table below, Caterpillar's profit from the sale of infringing machines

after the ALJ's October 1, 2018 infringement finding totaled approximately $96.6 million:

| Caterpillar Infringing Profits after Oct. 1, 2018[2] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | PM310 | PM312 | PM313 | PM620 | PM622 | PM820 | PM822 | PM825 |
| Q4 2018 | - | $405,774 | $260,725 | $488,931 | $1,936,510 | - | $583,071 | $302,796 |
| 2019 | $487,827 | $5,130,573 | $931,397 | $1,548,304 | $6,051,586 | $334,488 | $3,352,923 | $866,628 |
| 2020 | $216,162 | $5,126,556 | $782,758 | $1,108,445 | $7,453,454 | - | $5,468,509 | $1,474,329 |
| 2021 | $162,574 | $3,776,644 | $1,356,811 | $367,569 | $3,330,297 | - | $5,479,753 | $3,053,379 |
| 2022 | - | $2,847,304 | $262,505 | $904,610 | $5,864,957 | $303,551 | $2,970,325 | $968,322 |
| 2023 | - | $3,669,341 | $620,007 | $376,651 | $7,363,814 | - | $7,360,546 | $1,287,796 |
| Total: | $866,563 | $20,956,192 | $4,214,203 | $4,794,510 | $32,000,618 | $638,039 | $25,215,127 | $7,953,250 |

The length of Caterpillar's infringement spanned years—even after both Wirtgen's notice

and the ITC's finding of infringement. For these reasons, *Read* factor 6 favors enhancement.

### F.    The lack of remedial actions taken by Caterpillar supports enhancing damages (*Read* Factor 7).

Caterpillar had multiple opportunities to stop infringing. It could have stopped when

---

[2] Ex. 3332.

Wirtgen first requested it. It did not. It could have stopped after the ITC ALJ issued a decision finding that it infringed. It did not. It could have stopped after the ITC affirmed the ALJ. It did not. It could have stopped after the Federal Circuit affirmed the ITC. It did not. It could have contacted Wirtgen to seek a license on Wirtgen's patents in order to avoid infringement. It did not. Tr. 556:3–9. Instead, at every decision point, Caterpillar made a calculated decision to continue making, importing, and selling infringing machines. That Caterpillar implemented redesigns only after years of litigation (and even then for only some infringed patents) warrants enhancement under *Read* Factor 7. Tr. 1043:7–21; *see* Tr. 443:1–18, 443:25–445:14.

That is particularly so given that Caterpillar, by its own admission, could have avoided infringement earlier. Mr. Engelmann testified that Caterpillar was aware of various "potential design arounds" for "ride control, leg sensors, reverse shut off and hot swap" that "would take roughly two years to . . . design and implement" at a total estimated cost to Caterpillar of "5.4 million in design cost and validation cost." Tr. 443:1–445:14; Ex. 0263A.0005 (showing estimated "Design Costs," "Validation costs," and "Design Time" for purported "Ride Control," "Leg Sensors," "Reverse Shut-Off," and "Hot Swap" redesigns); *see also* Ex. 1625 ("Design Change Impact" document indicating Caterpillar awareness of "Design Change" for the '309 patent that was "$65k & Effective within 3 mo."). Mr. Reed also testified that Caterpillar could have changed designs. Tr. 1877:22–1878:4. He testified "that the prior hot swap system in the PM465 would address the '788 patent" and that "modifying the sensors, that would be associated with both the '530 and '972 patent, would address the '972 patent." Tr. 1826:4–20. Yet he confirmed at trial that Caterpillar never implemented any design changes for the '788 or '972 patents, and that Caterpillar continues to make and sell machines with these features to this day. Tr. 1878:12–1879:1. Indeed, every single cold planer machine Caterpillar has sold for the past

eight years infringes a Wirtgen patent. Tr. 1880:25–1881:5.

With respect to Caterpillar's design-arounds for the '641, '309, and '530 patents, Mr.

Reed testified that Caterpillar would have been aware of such design change options at the time

of the hypothetical negotiation—i.e., before *any* infringement began. Tr. 1879:2–18. He admitted

(i) that Caterpillar did not implement these changes until after the ITC's infringement findings on

these patents and (ii) that Caterpillar kept making and selling infringing machines for more than

two years thereafter. Tr. 1879:19–1880:8.

Time after time, Caterpillar failed to take remedial action to avoid or mitigate its

infringement. That conduct shows "a degree of dismissiveness" of Wirtgen's patent rights and

"disrespect of the value the law places on protection of intellectual property." *Applera Corp. v.

MJ Rsch. Inc.*, 372 F. Supp. 2d 233, 247 (D. Conn. 2005); *see Novozymes A/S v. Genencor Int'l,

Inc.*, 474 F. Supp. 2d 592, 611 (D. Del. 2007). This factor, too, favors enhancement.

**G.    Caterpillar was motivated to undercut Wirtgen in the cold planer machine
industry to gain market share (*Read* Factor 8).**

Wirtgen and Caterpillar are direct competitors in the cold planer market, and Caterpillar's

own witnesses confirmed it was "[a]bsolutely" Caterpillar's goal to take market share away from

Wirtgen to grow its own. Tr. 889:12–890:14, 890:21–891:17, 1763:18–21; *see* Ex. 0608.0001

("The cold planer strategy is to achieve 20+ PINS predominantly from Wirtgen and disrupt

Wirtgen Group's ability to subsidize their product portfolio."), .0015 (pie charts indicating

Caterpillar wanted to take market share from Wirtgen).

During the concept phase of Caterpillar's development of the infringing machines,

Caterpillar considered Wirtgen—the market leader—to be a threat to its business, as Caterpillar

was "borderline extinct" in the cold planer market. Tr. 1775:14–24, 1776:8–1777:18; Ex.

0105A.0003 (Nov. 4, 2014 presentation indicating: "Wirtgen is the clear cold planer market

leader. Their margins are an immediate threat to all other paving products and long term threat to all Cat products."), .0012 ("Need Help: CLPN [cold planers]: borderline extinct."). Indeed, Caterpillar "spend[s] more of [its] time speaking about Wirtgen and trying to understand them" because Wirtgen is the dominant market player. Tr. 1782:17–1783:22 (Hanback).

So Caterpillar copied Wirtgen's features and implemented them on its own machines. *See supra* Section I.A. The strategy worked. Caterpillar's infringing machines fared much better in the market and took sales away from Wirtgen. Caterpillar's market share doubled after introduction of its infringing machines, and Wirtgen's market share simultaneously decreased. Tr. 1860:12–1861:3. Where, as here, the evidence "demonstrate[s] that [Defendant] intended to aggressively compete head-to-head . . . with the express goal of luring away [Plaintiff's] customers and decreasing [Plaintiff's] market share," this constitutes "egregious infringement behavior" that "establishes the need for enhanced damages as a sufficient punitive measure." *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 55 (D.N.J. 2021). That is especially so given that the parties are direct competitors. *See nCUBE*, 313 F. Supp. 2d at 390.

*       *       *

Given the significant evidence of Caterpillar's misconduct in this case, the "particular circumstances" support treble damages. Caterpillar is a company with vast financial means. Despite these resources, Caterpillar tore down, analyzed, reverse-engineered, and copied Wirtgen's inventions—without any good-faith belief of invalidity or non-infringement—with the specific goal of taking market share from Wirtgen. It sold infringing machines for years, long after Wirtgen notified Caterpillar of its infringement and after the ITC confirmed it. It took no remedial actions to avoid infringement, despite its apparent belief that it *could* have designed around Wirtgen's patents. Instead of redesigning its infringing machines, Caterpillar moved their

13

manufacturing to the United States to avoid the ITC's exclusion order. And it doubled down on its infringement as it designed, manufactured, and sold new builds of its cold planer machines and—as late last year—released brand new rotary mixer machines using the same infringing technology. That egregious misconduct strongly favors enhancement.

## II.     This case is exceptional, justifying an award of Wirtgen's reasonable attorneys' fees.

The Court should also award attorneys' fees related to the willfully infringed '309, '530, '972, '641, and '788 patents. A court may award reasonable attorneys' fees to the prevailing party "in exceptional cases." 35 U.S.C. § 285. An "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Relevant considerations include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need" for "compensation and deterrence." *Id.* at 554 n.6.

Willfulness alone is "[a] sufficient basis" "for deeming th[e] case exceptional" and awarding attorneys' fees. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012). Here, there was much more: as said, Caterpillar willfully infringed for years, desperate to compete with Wirtgen at all costs, even if it meant circumventing a federal agency order and advancing spurious litigation arguments while knowing that it infringed valid patents. *Supra* Section I; *see Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 757 (N.D. Ohio 2010) (finding case "exceptional" "[f]or the reasons previously stated in favor of enhancement"). In short, Caterpillar tied up Wirtgen in litigation for years for no good reason. That harm cannot be undone, but the Court can and should award Wirtgen the attorneys' fees it expended to assert the patents found infringed.[3]

---

[3] Should the Court find this case exceptional under § 285, Wirtgen will separately submit a motion for attorney's fees under Federal Rule of Civil Procedure 54(d), "stat[ing] the amount

**III.    The Court should enjoin Caterpillar's infringement.**

In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court held that a permanent

injunction should issue if: (1) the plaintiff suffered irreparable injury; (2) monetary damages are

inadequate to compensate for that injury; (3) the balance of hardships favors the plaintiff; and (4)

the public interest favors an injunction. 547 U.S. 388, 391 (2006). In patent infringement cases,

courts have historically granted injunctions far more often than not "given the difficulty of

protecting a right to exclude through monetary remedies that allow an infringer to use an

invention against the patentee's wishes—a difficulty that often implicates the first two factors of

the traditional four-factor test." *Id.* at 395 (Roberts, J., concurring). Courts should take counsel

from these decades of precedent, as "a page of history is worth a volume of logic." *Id.*[4] Thus,

while "*eBay* abolishe[d the previous] rule that an injunction normally will issue when a patent is

found to have been valid and infringed, it d[id] not swing the pendulum in the opposite

direction." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).

All *eBay* factors favor an injunction here. Wirtgen therefore requests that:

- the Court enjoin Caterpillar's infringement of U.S. Patent Nos. 8,424,972 (parallel-to-surface; large cold planer machines), 7,946,788 (sensor switching; all cold planer machines), and 9,656,530 (intelligent leg control; rotary mixers) by Caterpillar's current machine design; and

- the Court enjoin Caterpillar's infringement of U.S. Patent Nos. 7,530,641 (safely driving backwards; all cold planer machines), 7,828,309 (full floating axle; large cold planer machines), and 9,656,530 (intelligent leg control; large cold planer machines) by Caterpillar's prior machine design (that is, the design Caterpillar used before it

---

sought or provid[ing] a fair estimate of it," within "14 days after the entry of judgment." *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-cv-1122, 2019 WL 4016235 (D. Del. Aug. 26, 2019) (14-day period does not trigger until the Court enters final judgment).

[4] *See also* Seaman, C., *Permanent Injunctions in Patent Litigation After eBay: An Empirical Study*, 101 Iowa L. Rev. 1949, 1969, 1990 (2016) (post-*eBay* empirical study showing that injunctions were granted in approximately 95% of cases pre-*eBay* and approximately 84% of cases post-*eBay* when accounting for cases brought by non-practicing entities).

implemented redesigns in the years following the ITC proceedings).

**A.  Wirtgen will be irreparably harmed absent an injunction because it directly competes with Caterpillar in the cold planer machine and rotary mixer markets (*eBay Factor* 1).**

To obtain an injunction, a patentee must show irreparable harm and a causal nexus between the infringement and the harm. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359–60 (Fed. Cir. 2013). "Direct competition" between the parties "suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012). This is particularly true where "[t]he Accused Products were intentionally developed with the goal of replacing, and directly competing with, [the patentee's] products." *Wonderland Switz. AG v. Evenflo Co.*, No. 1:20-cv-00727, 2023 WL 4098571, at *5 (D. Del. June 7, 2023). Regarding causal nexus, where the patent covers a machine feature, the patentee need only show "that a patented feature is one of several features that cause consumers to make their purchasing decisions." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 644 (Fed. Cir. 2015) (cleaned up). "[It] is enough that [the patentee] has shown that these features were related to infringement and were important to customers when they were examining their [product] choices." *Id*.

Caterpillar and Wirtgen are direct competitors. Ex. 105A.0003, 16, 19, 41, 43, 44; Ex. 0562.0018–19; Tr. 205:6–8, 363:7–13, 889:25–891:17, 1783:8–22; Ex. 608.0001, 15. Caterpillar intentionally designed its infringing machines to directly compete with Wirtgen. Tr. 411:25–412:5, 560:12–565:2; Ex. 0562.0019. Indeed, Caterpillar targeted Wirtgen's patented features after surveying customers to determine what features they most valued, Tr. 410:15–411:24, 665:22–666:15, 1784:16–1786:6; Ex. 0562.0029–30, as the following table shows:

| '972 pat. | Ex. 0047.0003 | Discussing "if we need to look for a solution that drives all legs" because CAT is "being bench marked against the Wirtgen PTS system[.]" |
| --- | --- | --- |

| | Ex. 0208A.0010–13 | 2011 Gateway Presentation discussing "Auto Rear Leg Control – Keeps Machine Parallel with Road" |
|---|---|---|
| | Ex. 0242A.0009, 21 | VOC survey praising patented feature |
| | Ex. 0593A, VOC Controls Tab, Rows 50, 58, 93, 437, 442 | VOC survey praising patented feature |
| | Ex. 0602.0107 | CAT Gateway identifying "Parallel to Surface Auto Leveling Technology" as a catch-up feature |
| | Ex. 0611.0039–40 | Identifying PM600 Product Design Features that were the "Output of Extensive LCP and VOC Activities" |
| | Tr. 319:3–320:10 | "PTS was again very welcomed because it allowed the operator to worry about one less thing that the machine now is doing automatically[.]" |
| | Tr. 420:18–422:24 (discussing Ex. 0604.0003) | "[W]e were looking into ways of accomplishing that [PTS] feature, it was feedback we had gotten from our customers that they would like something like that." |
| **'788 pat.** | Ex. 0611.0039–40 | Identifying PM600 Product Design Features that were the "Output of Extensive LCP and VOC Activities" |
| | Ex. 0242A.0007–9, 15, 17, 21 | VOC survey praising patented feature |
| | Ex. 0593A, VOC Controls Tab, Rows 54, 56, 62, 72, 74, 84, 95, 274, 441 | VOC survey praising patented feature |
| | Tr. 322:3–324:2 | "[T]his was also another feature that was very well received because it enhanced the productivity and automated something that before had to be manually done and compared." |
| | Tr. 428:23–432:17 (discussing Ex. 0064.0040) | "[P]art of that initiative for intuitive grade and slope display was the ability to change sensors as well as target and measured values." |
| **'530 pat.[5]** | Ex. 589.0007 | CAT brochure advertising "[f]our leg posts with position sensors" |
| | Tr. 320:11–322:2 | "[T]he intelligent leg controls were definitely a game changer." |
| **'641 pat.** | Ex. 593A.0026 | VOC survey: "HATES propel shut down when reversing with rotor engaged. Ken, told dealer, 'if you don't come out here and get rid of that function I am going to send this machine back and go buy a Wirtgen.'" |

---

[5] Although Caterpillar's early research focused on Wirtgen's cold planer machines, Caterpillar implemented the same sensing technology claimed in the '530 patent in its rotary mixers. Tr. 451:16–452:7. That technology was necessary to assist with steering and calculating rotor depth, two functions crucial to general machine operation. Tr. 380:3–21, 544:1–14.

| '309 pat. | Ex. 589.0007 | CAT brochure advertising "[r]ide control" |

Caterpillar even tore Wirtgen's machines down to the bolt to determine how those features operated so that it could compete with Wirtgen. Tr. 408:9–409:17, 410:5–14, 412:6–20, 417:21–419:23; Ex. 0561.0038; Ex. 0562.0041. And Caterpillar specifically advertised its infringing features to its customers. Tr. 1802:11-1804:12; Ex. 589. Wirtgen then lost market share equal to the share gained by Caterpillar upon Caterpillar's introduction of its infringing machines. Tr. 205:9–207:11, 221:14–23, 242:11–14, 1860:12–1861:3; Ex. 3368. Caterpillar's infringement thus directly caused Wirtgen—its primary competitor—to lose market share. That sort of injury is a classic example of irreparable harm. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). Critically, that is so even if the patentee manages, through "marketing and sales, engineering, and research and development," to regain market share notwithstanding the infringement. *Id.*[6] This factor thus strongly favors an injunction.

### B.   Damages cannot compensate for the future harm Caterpillar's continued infringement will cause (*eBay Factor* 2).

Damages are inadequate to compensate for loss of market share. *Douglas*, 717 F.3d at 1345 (also emphasizing that a patentee should not "suffer some penalty for managing through great effort to maintain market share in the face of infringing competition"). A patentee's unwillingness to license its technology to competitors also weighs in favor of a conclusion that the patentee has no adequate remedy at law, *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1327–28 (Fed. Cir. 2008), as does a lengthy litigation to protect the patentee's decision not to do so, *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*, 821 F. Supp. 2d 681, 694

---

[6] Regarding prior infringing machine designs, "[p]ast harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee '*has suffered* an irreparable injury.'" *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861–62 (Fed. Cir. 2010) (quoting *eBay*, 547 U.S. at 391).

(D.N.J. 2011). Furthermore, "[s]ales lost by [a patentee] to [an infringer] are difficult to quantify due to the 'ecosystem effect'—that is, the effect the sale of a single product can have on downstream sales of accessories, computers, software applications, and future smartphones and tablets." *Apple*, 809 F.3d at 634. "This factor strongly weighs in favor of" a patentee because the extent of such "downstream and network effect losses are very difficult to quantify." *Id.*

All the hallmarks of the inadequacy of damages are present here. As noted above, the parties are direct competitors, and Wirtgen lost market share to Caterpillar due to Caterpillar's infringement. Wirtgen decision-makers testified that they were not interested in licensing the patented technology implemented in their machines to Caterpillar (or to anyone else, for that matter). Tr. 217:25–218:8, 280:4–14, 283:6–286:7; Ex. 2946. Furthermore, witnesses for both sides testified regarding the importance of ecosystem effects, e.g., commonality of parts and operating systems, in selling road construction machines. Tr. 311:14–23, 343:21–25, 1232:24–1233:6, 1763:22–1764:15, 1768:6–1770:14, 1863:16–23. Acknowledging this ecosystem effect, Caterpillar's go-to-market strategy explicitly noted its focus on fleet packages and its goal to provide a full range of cold planers. Ex. 0390.0018; Ex. 0562.0010, 20–24.

Regarding the prior infringing machine designs, Caterpillar's behavior demonstrates that, absent an injunction, it will deliberately infringe if it is financially beneficial to do so. After the ITC found Caterpillar's earlier designs to infringe, it moved manufacturing of those machines to the United States to avoid the ITC exclusion orders and continue to infringe. Tr. 441:3–442:21. Caterpillar also made the rotary mixers that the jury found to infringe the '530 patent in the United States, despite the ITC's determination that its similarly designed cold planer machines infringed the '530 patent. Tr. 451:16–452:7. As Caterpillar continues to build out its product line to compete with Wirtgen, Ex. 0105A.0003–12, there is every reason to think it would revert to

19

prior infringing designs if it decides that potential profits outweigh litigation costs. The Court should enter an injunction to prevent that from happening.

### C.     The balance of hardships favors an injunction (*eBay Factor* 3).

Patent protection is crucial to a technology-driven company like Wirtgen. Wirtgen invested millions of dollars to develop the patented features that make it the market leader. Tr. 209:9–210:21, 277:24–280:3. Wirtgen likewise expended significant resources for the past eight years seeking to stop Caterpillar from infringing the '972, '788, and '530 patents. Tr. 218:9–220:20, 242:25–243:8. The burden of competing with one's own patented invention is substantial and weighs in favor of granting an injunction. *Robert Bosch*, 659 F.3d at 1156. This is particularly true here, where Caterpillar was undercutting Wirtgen's pricing. Ex. 0105A.0030; Ex. 0390.0010–11; Tr. 211:1–212:9, 235:11–16, 1861:4–7.

Moreover, Caterpillar, having willfully infringed, will not suffer cognizable harm from an injunction.[7] "The fact that the enjoined portion of [Defendant's] business was built on infringing products [] weighs against the hardship [Defendant] will suffer by being enjoined." *Wonderland*, 2023 WL 4098571, at *8 (citation omitted). Caterpillar should not be heard to argue that it will be harmed by an injunction given its assertion that acceptable non-infringing alternatives exist, would be quick and relatively inexpensive to implement, and would not affect the sales price. Tr. 1061:8–1063:5, 1066:20–1074:12, 1190:12–1192:1, 1206:20–1207:18, 1722:11–1727:15, 1821:13–1826:20, 1832:2–1834:18, 1877:16–1879:18; Ex. 0263A.0002–05. Indeed, Caterpillar already designed around certain patents in response to the ITC's exclusion order. It could have undertaken similar design-around efforts for the patents in question but chose not to. *Broadcom*

---

[7] Considering Caterpillar's size and sophistication, injunctive relief is also not an existential threat to Caterpillar. Tr. 225:2–12.

*Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008). It should now have to live with the consequences of that choice. This factor, too, favors an injunction against Caterpillar.

> **D.      An injunction furthers the public interest (*eBay Factor* 4).**

The public has a strong interest in a robust patent system, enforced through injunctions, that protects the property rights of patent holders. *Apple*, 809 F.3d at 646–47. Injunctions in patent cases only rarely disserve the public interest, and typically only where an injunction would negatively impact public health or safety. *Vanda Pharms. Inc. v. Roxane Labs., Inc*., C.A. No. 13-1973, 2016 WL 4490701, at *16 (D. Del. Aug. 25, 2016); *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 394 (E.D. Tex. 2009). Caterpillar cannot credibly argue for any such impact here. Indeed, an injunction will not limit the public's access to the relevant products at all because (i) Wirtgen has the capacity to supply any machines that Caterpillar would have supplied; (ii) other manufactures sell into the same market; and (iii) Caterpillar can continue to sell machines if it redesigns to avoid infringement. Tr. 208:16–209:8, 1781:9–1782:16; *see Metalcraft of Mayville, Inc. v. The Toro Company*, 848 F.3d 1358, 1369 (Fed. Cir. 2017). This factor favors a grant of injunction against Caterpillar.

The public has a strong interest in promoting patent rights. Wirtgen's reputation as an innovator, its exclusivity rights, and its market position have been irreparably harmed by Caterpillar's infringement, and that will continue until Caterpillar is stopped. Accordingly, Wirtgen requests the Court permanently enjoin Caterpillar from selling its infringing machines.

## IV.      Should it deny injunctive relief, the Court should award an ongoing royalty.

Money cannot fully rectify the harm from Caterpillar's infringement. But, if the Court declines an injunction, it should at the very least award an ongoing royalty for Caterpillar's continued infringement so that Wirtgen receives some compensation for that harm. An ongoing royalty is especially appropriate where, as here, the parties have a demonstrated history of failed

21

negotiations and Caterpillar continues to sell infringing products and services. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314–15 (Fed. Cir. 2007); *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, C.A. No. 04-876, 2014 WL 1457797, at *1, *5 (D. Del. Apr. 14, 2014).

Specifically, Wirtgen requests that the Court award the following amounts:

| Patent | Infringing Products | Per-Unit Royalty |
|---|---|---|
| 8,424,972 | Large cold planer machines | $49,685.82 to $74,528.73 |
| 7,946,788 | All cold planer machines | $14,483.32 to $21,724.97 |
| 9,656,530 | Rotary mixers | $29,593.61 to $44,390.41 |

These ranges result from dividing the jury award by the number of infringing units included in the jury award to arrive at a per-unit royalty and multiplying that royalty by two to three times to account for the change in bargaining positions post-verdict.

"[C]ourts frequently impose a post-verdict ongoing royalty rate that is higher than the reasonable royalty found at trial." *Telecordia*, 2014 WL 1457797, at *4 & n.8 (collecting cases). "Once a judgment of validity and infringement has been entered . . . the royalty calculus is markedly different because different economic factors are involved." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008); *see Telecordia*, 2014 WL 1457797, at *2–4 (awarding ongoing royalty almost double jury award due to stronger bargaining position even absent willfulness finding). Here, the calculus is *especially* different. The jury found *willful* infringement, meaning Caterpillar knows in any post-verdict negotiation that it risks treble damages. *See, e.g.*, *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, No. 14-cv-62369, 2017 WL 7732873, at *1–4 (S.D. Fla. Jan. 3, 2017) (relying on jury award as a starting point and doubling the ongoing royalty for willfulness), *aff'd*, 876 F.3d 1350, 1370 (Fed. Cir. 2017).

Wirtgen, moreover, expended material resources to enforce its patents. The jury's damages number was based on a hypothetical negotiation occurring before infringement, so it does not account for the significant time and costs Wirtgen incurred to bring this lawsuit and see

it through to a verdict. A higher forward-looking rate is necessary to compensate Wirtgen for its enforcement expenditures and for Caterpillar's continued and unauthorized use of Wirtgen's technology. If the Court imposed an ongoing royalty merely equal to the pre-verdict rate, others might see Caterpillar's continued infringement as a low-cost option that would entail payment only if and when Wirtgen chooses to assert its patents.

## V.   Supplemental damages and prejudgment and post-judgment interest are warranted for Wirtgen as the prevailing party.

**Supplemental damages.** Courts should award prevailing patent owners "no . . . less than a reasonable royalty," 35 U.S.C. § 284, "for periods of infringement not considered by the jury," *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012). Because the sales numbers Caterpillar provided at the time of trial only included sales that occurred before or in 2023, *see* Ex. 3322, the jury was not able to award damages for infringing sales that were not included on Ex. 3322 but occurred before the date on which the Court enters judgment.

Wirtgen is entitled to an accounting of Caterpillar's sales not included on Ex. 3322 that occur before judgment is entered. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1380–81 & n.10 (Fed. Cir. 2013) (collecting cases). Delaware courts have awarded supplemental damages when, as here, the relevant financial data was not produced by the defendant prior to trial. *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 450 (D. Del. 2023); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, C.A. No. 15-634, 2019 WL 1877189, at *5 (D. Del. Apr. 26, 2019). Accordingly, Wirtgen respectfully requests that the Court order an accounting of Caterpillar's sales of infringing products not included on Ex. 3322 that occur before the date on which the Court enters judgment, and award supplemental

damages for all such infringing sales at no less than the jury's per-unit royalty rate.[8]

**Prejudgment interest.** An award of prejudgment interest is "the rule, not the exception." *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012). It is typically awarded to restore a plaintiff to the position it would have been in had there been no wrongdoing. *Gen. Motors. Corp. v. Devex Corp.*, 461 U.S. 648, 655–57 (1983). Courts in Delaware typically award prejudgment interest at the prime rate, compounded quarterly. *ArcherDX*, 2022 WL 4597877, at *18 (collecting cases); *see Wonderland Switzerland AG v. Evenflo Co.*, No. 1:20-cv-00727, 2023 WL 5497918, at *3 (D. Del. July 24, 2023). Compounding quarterly is consistent with industry practice. *Bayer*, 2019 WL 4016235, at *7.

Prejudgment interest is necessary to adequately compensate Wirtgen. There are no special circumstances to justify withholding full compensation. Wirtgen faithfully pursued its claims against Caterpillar without delay, and the jury returned a verdict in Wirtgen's favor. Even in cases where litigation was stayed pending a parallel proceeding over the same patents, courts have awarded prejudgment interest, including for the stayed period, where both parties requested the stay. *See, e.g.*, *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 791–92 (Fed. Cir. 1990); *St. Clair Intell. Prop. Consultants, Inc. v. Fuji Photo Film Co., Ltd.*, 674 F. Supp. 2d 555, 561–62 (D. Del. 2009). Wirtgen thus requests the Court award prejudgment interest on the jury verdict award and any supplemental damages awarded by the Court at the prime rate, compounded quarterly. The damages period began on April 29, 2016, for the '309, '641, and '788 patents; May 23, 2017, for the '530 patent; and September 2, 2021, for the '972 patent. Dr. Seth has calculated the prejudgment interest rate by applying the per annum Bank Prime Loan

---

[8] If supplemental damages are awarded, Wirtgen will provide a supplemental damages calculation after receiving an accounting from Caterpillar.

Rate reported at the quarterly average level by the St. Louis Federal Reserve, compounded quarterly and using a mid-period convention over the time period for damages, amounting to $2,920,084.65 in prejudgment interest for sales reported on Caterpillar's most current sales document (Ex. 3322) (this does not include the supplemental damages period). Seth Decl. ¶ 6.[9]

**Post-judgment interest.** Post-judgement interest is mandated in civil cases at "a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. Post-judgment interest on the total money award is computed daily and compounded annually. *Id.*; *Eaves v. Cnty. of Cape May*, 239 F.3d 527, 534 (3d Cir. 2001). And it begins accruing when the district court enters final judgment quantifying the damages award. *Hologic, Inc. v. Minerva Surgical, Inc.*, 957 F.3d 1256, 1274 (Fed. Cir. 2020). Any enhanced damages, supplemental damages, pre-judgment interest, and attorneys' fees will also be subject to post-judgment interest starting upon the date the Court enters judgment quantifying each category of damages. *See Eaves*, 239 F.3d at 534 (awarding post-judgment interest on attorneys' fees from the date that amount is fixed). Daily post-judgment interest continues until all owed amounts are paid.

## VI.    Conclusion

This Court should (i) award treble damages, (ii) grant Wirtgen's reasonable attorneys' fees, (iii) enjoin Caterpillar's infringement or else impose an ongoing royalty, and (iv) award supplemental damages and prejudgment and post-judgment interest.

---

[9] If supplemental damages are awarded, Wirtgen will provide a prejudgment interest calculation for the supplemental damages after receiving an accounting from Caterpillar.

Dated: May 1, 2024

*Of Counsel:*
Ryan D. Levy
Seth R. Ogden
William E. Sekyi
Mark A. Kilgore
PATTERSON INTELLECTUAL PROPERTY LAW, P.C.
Roundabout Plaza
1600 Division Street, Suite 500
Nashville, Tennessee 37203
(615) 242-2400
rdl@iplawgroup.com
sro@iplawgroup.com
wes@iplawgroup.com
mak@iplawgroup.com

　　- and -

Daniel E. Yonan
Paul A. Ainsworth
R. Wilson Powers III
Kyle E. Conklin
Deirdre M. Wells
Joseph H. Kim
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Ave., NW, Suite 600
Washington, DC 20005
(202) 371-2600
*dyonan@sternekessler.com*
*painsworth@sternekessler.com*
*tpowers@sternekessler.com*
*kconklin@sternekessler.com*
*dwells@sternekessler.com*
*josephk@sternekessler.com*

*Attorneys for Wirtgen America, Inc.*

Respectfully submitted,

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
*apoff@ycst.com*
*swilson@ycst.com*

## **CERTIFICATE OF SERVICE**

I, Adam W. Poff Esquire, hereby certify that on May 1, 2024, I caused the foregoing

document to be served by email upon the following counsel:

Bindu A. Palapura
Andrew L. Brown
POTTER ANDERSON & CORROON, LLP
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
*bpalapura@potteranderson.com*
*abrown@potteranderson.com*

James C. Yoon
Ryan R. Smith
Christopher Mays
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304
*jyoon@wsgr.com*
*rsmith@wsgr.com*
*cmays@wsgr.com*

Lucy Yen
Michelle Dang
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
*lyen@wsgr.com*
*mdang@wsgr.com*

Matthew A. Macdonald
Naoya Son
Alexander Turner
Neil N. Desai
WILSON SONSINI GOODRICH &
ROSATI, P.C.
953 East Third Street
Suite 100
Los Angeles, CA 90013
*matthew.macdonald@wsgr.com*
*nson@wsgr.com*
*aturner@wsgr.com*
*ndesai@wsgr.com*

*caterpillar@wsgr.com*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Adam W. Poff*

Adam W. Poff (No. 3990)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff*