# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **WIRTGEN AMERICA, INC.,** | **Case No. 1:17-cv-00770-JDW** |
| *Plaintiff,* | |
| v. | |
| **CATERPILLAR, INC.,** | |
| *Defendant.* | |

## MEMORANDUM

This patent litigation between Wirtgen America, Inc. and Caterpillar, Inc. concerns patents for road construction and repair. A jury concluded that Caterpillar willfully infringed five of Wirtgen's patents: (1) U.S. Patent No. 7,828,309 ('309 Patent); (2) U.S. Patent No. 7,530,641 ('641 Patent); (3) U.S. Patent No. 9,656,530 ('530 Patent); (4) U.S. Patent No. 7,946,788 ('788 Patent); and (5) U.S. Patent No. 8,424,972 ('972 Patent). Caterpillar asserts equitable defenses as to the '309, '530, and '788 Patents based on claims of judicial estoppel, prosecution laches, and collateral estoppel.

"Laches and estoppel are equitable defenses, committed to the sound discretion of the trial court." *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1292 (Fed. Cir. 1992). Those defenses turn on factual determinations. *See id.* After consideration of the evidence presented and relevant law, I make the following findings of fact and conclusions

of law pursuant to Fed R. Civ. P. 52(a) with respect to those equitable defenses.[1] Because Caterpillar asserts a different defense as to each patent, I make the findings of fact and conclusions of law on a patent-by-patent basis.

## I.    '309 PATENT

### A.    Findings Of Fact

1.      The '309 Patent discloses a stability pattern for road milling machines, which is useful when those machines travel on uneven terrain. Claim 29 recites a machine with "a four sided stability pattern having a widest transverse dimension, transverse to the forward direction of the chassis, which widest transverse dimension falls within a footprint of the working roller or rotor." ('309 Patent at 14:33-36.)

2.      Claim 29 has two component parts: (a) there's a stability pattern, and (b) that pattern's widest dimension occupies a specific position relative to the machine.

3.      In an IPR proceeding, Caterpillar challenged the validity of Claim 29 under the theory that it was obvious as an inherent teaching of two prior art references ("Swisher" and "Neumeier"). In that proceeding, Wirtgen argued that Caterpillar didn't meet its burden to establish obviousness. Wirtgen contended that Swisher and Neumeier didn't necessarily disclose Claim 29's limitation.

---

[1] Caterpillar also asks me to find that the '268 Patent is unenforceable because of equitable and absolute intervening rights. The jury determined that the '268 Patent is invalid and not infringed, so I will not rule on this aspect of Caterpillar's Motion unless I grant Wirtgen's renewed judgment as a matter of law regarding that patent.

4.      The PTAB agreed with Wirtgen. It held that "the evidence before us as to whether the four-sided stability pattern is inherent in the Swisher/Neumeier combination ... and whether the widest transverse direction of the pattern necessarily falls within the milling drum's footprint, is that the evidence is uncertain in an area where the law urges caution and clarity." (D.I. 369-12 at 53-54.) The PTAB went on to say that the limitation *may* have been disclosed in prior art, but as a matter of law, that can't establish obviousness. (*Id.* at 54 (citing *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014)). The PTAB therefore held Claim 29 of the '309 Patent not unpatentable over Caterpillar's Swisher/Neumeier combination.

5.      At trial in this case, Wirtgen's expert Dr. Lumkes opined that the Accused Machines practice Claim 29 of the '309 Patent. He testified that the Accused Machines' hydraulic coupling produces a four-sided stability pattern and that their stability pattern falls within the rotor. In his view, the Accused Machines' stability pattern "had to occur at the midpoints of the legs, since all the cylinders are equal value ... [which] is going to cause that pivot point to be in the middle of those legs." (Tr.[2] 596:4-24.)

6.      Dr. Lumkes evaluated a computer-aided design file ("CAD") of the Accused Machines to determine that the stability pattern falls within the rotor's footprint. The CAD model that Caterpillar provided is a "very detailed, very large file, down to the nuts and washers and bolts on the machine" which is essentially "a blueprint for which the

---

[2] All citations to "Tr." refer to the trial transcript.

machine is built from." (Tr. 597:3-7.) It allowed Dr. Lumkes to measure the dimensions of one of the Accused Machines, the PM620. Dr. Lumkes also inspected certain Caterpillar machines and took measurements "to confirm that the dimensions that were on the CAD file … were correct." (Tr. 601:14-17.)

7. When asked on cross-examination, Dr. Lumkes did not agree that the claimed stability pattern is inherent from any cold milling machine. (Tr. 649:10-16.)

**B.** **Conclusions Of Law**

8. Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation and citation omitted). Third Circuit law governs this analysis in a patent case. *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1378 (Fed. Cir. 2020).

9. Judicial estoppel is often "the harshest remedy." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir. 2001). As a result, it is only appropriate when there were (a) irreconcilably inconsistent positions, (b) adopted in bad faith, and (c) a showing that estoppel addresses the harm and no lesser sanction is sufficient. *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009), *as amended* (Dec. 4, 2009).

10. As a threshold matter, Wirtgen argues that Caterpillar has forfeited its right to raise a judicial estoppel argument. The "*only* legitimate" purpose of judicial

estoppel is to "protect the courts rather than the litigants." *Bulger*, 243 F.3d at 785 (emphasis in original). Courts may protect themselves by raising judicial estoppel *sua sponte* even after a litigant has forfeited that argument. *See, e.g.*, *1st Source Bank v. Neto*, 861 F.3d 607, 612 (7th Cir. 2017); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 325 (3d Cir. 2003) (judicial estoppel raised *sua sponte*). I will therefore reach the merits of Caterpillar's argument.

11.     Wirtgen didn't assume irreconcilably inconsistent positions between the IPR challenge and this litigation. In the IPR, Wirtgen argued that a *hypothetical* machine based on Swisher and Neumeier would not *necessarily* result in a stability pattern with its widest transverse dimension falling within the rotor. In this case, Wirtgen argued that the Accused Machines did *in fact* have a stability pattern with its widest transverse dimension falling within the rotor.

12.     In the IPR, Wirtgen countered Caterpillar's obviousness argument with the contention that prior art didn't inherently disclose Claim 29's limitations. Inherency "may supply a missing claim limitation in an obviousness analysis." *PAR Pharm., Inc.*, 773 F.3d at 1194-95. But this doctrine poses a high bar. *See id.* at 1195. The party advancing an inherency argument must show that "the limitation at issue is the 'natural result' of the combination of prior art elements." *See id.* (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981)). "[P]robabilities or possibilities" won't suffice. *Id.*

13.     Wirtgen argued in the IPR that Caterpillar didn't meet this burden because Swisher and Neumeier didn't necessarily disclose Claim 29's limitation. However, in this litigation, Wirtgen's expert opined that the Accused Machines meet this claim limit.

14.     Caterpillar argues that Dr. Lumkes adopted an argument that looks a lot like inherency, which creates an inconsistency. This argument is unconvincing. First, it oversimplifies Dr. Lumkes's analysis. Dr. Lumkes based his infringement finding on his assessment of a CAD file and inspection of the Accused Machines. In his opinion, the CAD file revealed certain features about the legs and cylinders in the Accused Machines, which allowed him to determine the stability pattern of those machines.

15.     Caterpillar says that it's a leap of logic for Dr. Lumkes to find an infringing stability pattern just from those legs and cylinders when the '309 Patent cites instances where the stability pattern wouldn't automatically result. It also says that Dr. Lumkes didn't rule out those scenarios. But this disagreement with Dr. Lumkes's method or conclusions doesn't support the application of judicial estoppel. Instead, Caterpillar could, and did, point out to the jury why (in its estimation) Dr. Lumkes's opinion rested on a flawed foundation.

16.     Second, Caterpillar's argument overstates the scope of Dr. Lumkes's conclusion. Dr. Lumkes didn't conclude that a stability pattern with its widest transverse dimension falling within the rotor *would be* present in *any* hypothetical machine, only that it *is* present in the *Accused* Machines. That's clear from Dr. Lumkes's testimony,

where he disclaimed that a four-sided stability pattern is necessarily inherent in "any cold milling machine." (Trial Tr. 649:10-16.)

17.    "Judicial estoppel is … not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be." *Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 319. It does not apply with respect to the '309 Patent.

## II.    '530 PATENT

### A.    Findings Of Fact

18.    The '530 Patent is a continuation of U.S. Patent No. 9,010,871 ('871 Patent), which itself is a continuation of U.S. Patent No. 8,113,592 ('592 Patent) (together, "the '530 Patent family").

19.    The application for the '592 Patent was initiated on March 12, 2008.

20.    In 2010, during the prosecution of the '592 Patent, the Patent Office cited a Caterpillar prior art patent application disclosing legs that adjust together as if they were a single central jack. In response, Wirtgen claimed a road construction machine with "each" "individually adjustable legs."

21.    The application for the '871 Patent was initiated on January 17, 2012.

22.    For all claims granted in the '592 and '871 Patents, the invention required each leg of the road construction machine to be "individually adjustable."

23.    The application for the '530 Patent was initiated on April 10, 2015.

24.     In December 2016, Wirtgen acquired a newly released Caterpillar road milling machine, the PM620. On March 14, 2017, Wirtgen acquired and then analyzed a Caterpillar PM622.

25.     On March 23, 2017, Wirtgen amended the '530 Patent's application. It removed the requirement that each leg of the machine be individually adjustable. What resulted was a broader claim scope—each claimed machine's legs need only be "adjustable" (and not "individually adjustable").

26.     The '530 Patent family received roughly three years of Patent Term Adjustments to account for Patent Office delays. The '592 Patent received 688 days, the '871 Patent received 239 days, and the '530 Patent received 181 days.

**B.    Conclusions Of Law**

27.     Prosecution laches may "render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under a totality of the circumstances" and that delay causes prejudice to the accused infringer. *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1360, 1362 (Fed. Cir. 2021). It requires proving "(1) the patentee's delay in prosecution must be unreasonable and inexcusable under the totality of circumstances and (2) the accused infringer must have suffered prejudice attributable to the delay." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 57 F.4th 1346, 1354 (Fed. Cir. 2023). The doctrine should be "sparingly" applied only to "egregious cases of misuse of the

statutory patent system." *Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005).

28.     Though "[t]he Federal Circuit has not expressly clarified an accused infringer's burden of proof for prosecution laches[,]" I follow other courts that have applied the clear and convincing evidence standard. *Sonos, Inc. v. Google LLC*, No. C 20-06754 WHA, 2023 WL 6542320, at *16 (N.D. Cal. Oct. 6, 2023). This standard is consistent with the presumption of validity and with the application of the clear and convincing evidence standard to other unenforceability defenses. *See Natera, Inc. v. ArcherDX, Inc.*, 690 F. Supp. 3d 437, 445 (D. Del. 2023) (collecting cases).

29.     The prosecution history for the '530 Patent does not demonstrate unreasonable delay. Caterpillar counts the time from the initial application for the original '592 Patent to when the '530 Patent issued. Eight years elapsed before Wirtgen dropped the individually-adjustable-leg requirement. Even if I discount this delay by the Patent Term Adjustments for the '530 Patent family, there remains a five-year delay.[3] But "prosecution laches is not simply a time-counting exercise." *Seagen Inc. v. Daiichi Sankyo Co.*, No. 2:20-CV-00337-JRG, 2022 WL 2789901, at *7 (E.D. Tex. July 15, 2022). Wirtgen's conduct also matters.

---

[3] When an applicant himself creates delays, he cannot later blame the PTO. *See Personalized Media Commc'ns, LLC*, 57 F.4th at 1355. But here I find no evidence that Wirtgen intentionally created prosecution delays for which it is trying to shift the blame. Thus, I can discount the eight-year delay that Caterpillar cites.

30.     There's no evidence to suggest that Wirtgen "employed an inequitable scheme to extent its patent rights." *Personalized Media Commc'ns, LLC*, 57 F.4th 1350. Wirtgen's actions differ in material ways from situations where courts have applied prosecution laches. For example, Caterpillar does not offer evidence or argue that Wirtgen requested or received unusual extensions during prosecution of the '530 Patent. *See Natera, Inc.*, 690 F. Supp. 3d at 446 (inequitable conduct may include filing hundreds of applications, receiving extensions and unreasonably increasing the number of claims). It also does not argue that there are "unexplained gaps" in the prosecution history. *See id.* at 447 (quoting *Seagen Inc.*, 2022 WL 2789901, at *6). Caterpillar cites an eight-year delay, but "[d]uration of prosecution … does not provide a bright-line rule as to the reasonableness of prosecution." *Cordance Corp. v. Amazon.com*, 631 F. Supp. 2d 484, 491 (D. Del. 2009).

31.     What Caterpillar cites as inequitable is Wirtgen's last-minute broadening of the claims to reach Caterpillar's machines. There is a close temporal connection between Wirtgen's acquisition and study of the Caterpillar machines and its amendment of the claim. I infer that those machines motivated Wirtgen to broaden its claim. But, even so, "there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution

of a patent application." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988).

32.     As a result, even a finding that a party "drafted patent claims to cover [its competitor's] products ... [does] not by itself require a finding of prosecution laches." *SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-CV-497-TJW-CE, 2011 WL 2729214, at *7 (E.D. Tex. July 13, 2011); *see also Ormco Corp. v. Align Tech., Inc.*, 647 F. Supp.2d 1200, 1207 (C.D. Cal. 2009). By amending its patent in this manner, Wirtgen did not engage in an egregious "misuse" of the patent system. *SynQor, Inc.*, 2011 WL 2729214, at *7.

33.      Absent unfair conduct, courts routinely decline to apply prosecution laches when evaluating delays of this length or longer. *See Natera, Inc.*, 690 F. Supp.3d at 447 (collecting cases with seven-, eight-, ten-, and fourteen-year delays).

34.     Caterpillar cites to *Hyatt* for the proposition that a six-year delay is presumptively unreasonable. *See Hyatt*, 998 F.3d at 1370. But the Federal Circuit was ruling both in a different context (whether laches is an available defense to the PTO in an action to obtain a patent under § 145) and on a different issue (the delay between learning of infringement and filing suit). *See id.* As a result, some courts have been skeptical to extend this presumption to a prosecution laches defense. *See Personalized Media Commc'ns, LLC v. Apple, Inc.*, 552 F. Supp. 3d 664, 685 (E.D. Tex. 2021), *aff'd*, 57 F.4th 1346 (Fed. Cir. 2023); *Sonos, Inc.*, 2023 WL 6542320, at *16 n.7. Caterpillar hasn't

convinced me that I must apply the *Hyatt* presumption in this context, and I decline to do so.

35.     Caterpillar has presented evidence that raises some questions about Wirtgen's conduct. But there's not enough evidence to satisfy the clear and convincing evidence standard. Because the first element of the test is not satisfied, I don't have to address the second element.

**III.     '788 PATENT**

**A.     Findings Of Fact**

36.     The '788 Patent relates to a road construction machine with a leveling device to produce an even milled surface. It claims a machine with a sensor switching that doesn't interrupt the milling process. The invention allows that "[a]t the time of switchover, the sensor can ... be changed without any alteration of the currently applicable adjustment value." ('788 Patent at 2:4-7.)

37.     Claim 1 of the '788 Patent recites:

A road construction machine for the treatment of road surfaces, comprising:

a milling drum, the milling drum being height adjustable with regard to milling depth and/or slope; and

a leveling system operable to control the milling depth and/or the slope of the milling drum, the leveling system including:

a plurality of selectable sensors for sensing current actual values of operating parameters including the milling depth and/or the slope of the milling drum relative to a reference surface;

a plurality of indication and setting devices, each of the indication and setting devices being associatable with at least one of the plurality of selectable sensors, each indication and setting device being operable to indicate the current actual value of and to set a set value for the operating parameter sensed by its associated sensor;

a controller operable to control the milling depth and/or the slope of the milling drum conditioned on set values and sensed current actual values of the operating parameters sensed by a selected subset of the plurality of selectable sensors by returning at least one adjustment value to adjust the milling depth and/or slope of the milling drum so that the sensed current actual values of the operating parameters approach the set values for the selected subset of the plurality of selectable sensors;

a switchover device operable to switch over from control based upon a first selected subset of the plurality of selectable sensors to control based upon a second selected subset, the second selected subset exchanging at least one replacement sensor not in the first subset for at least one replaced sensor that was in the first subset; and

the controller being operable to effect switchover from control based upon the first selected subset of selectable sensors to control based upon the second selected subset of selectable sensors during milling operation without interruption of the milling operation and without any erratic alteration of the at least one adjustment value for adjusting the milling depth and/or slope of the milling drum.

('788 Patent at 7:2-45.)

38.     Claim 5 of the '788 Patent depends on Claim 1. ('788 Patent at 7:64.)

39.     Claim 5 of the '788 Patent recites:

The road construction machine of claim 1, wherein: the switchover device and the one of the indication and setting devices associated with the replacement sensor are operable to pre-select the replacement sensor and to pre-set the operating parameter of the replacement sensor prior to effecting the switchover.

('788 Patent at 7:64-8:2.)

40.     U.S. Patent No. 8,308,395 is a continuation of the '788 Patent. (D.I. 367 ¶ 5 n.7.) A continuation patent application is "an application filed subsequently to another application, while the prior application is pending, disclosing all or a substantial part of the subject matter of the prior application and containing claims to subject-matter common to both applications, both applications being filed by the same inventor or his legal representative." *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1348 n.1 (Fed. Cir. 2016) (internal quotation marks and citation omitted).

41.     The '395 Patent also relates to a sensor-switching device for a road construction machine. The specification teaches that "[a]ll embodiments indicate the set values and actual values of the pre-selected sensor [] which is to be exchanged for a previously used sensor ..." ('395 Patent at 6:45-47.) "It is possible in this way to pre-set all setting values (set values and actual values of the pre-selected sensor ... prior to entering a switchover command." (*Id.* at 6:48-52.)

42.     The invention disclosed in Claim 1 of the '395 Patent is a road construction machine with the capability of selecting a replacement sensor and setting an operating parameter.

43.     Claim 1 of the '395 Patent recites:

A road construction machine for the treatment of road surfaces, comprising:

a milling drum, the milling drum being position adjustable with regard to at least one position characteristic selected from the group consisting of milling depth of the drum and slope of the drum; and

a leveling system configured to control the at least one position characteristic, the leveling system including:

a plurality of selectable sensors, each sensor configured to sense a current actual value of an operating parameter corresponding to at least one of the milling depth of the drum and the slope of the drum;

a plurality of indication and setting devices, each of the indication and setting devices being associatable with at least one of the plurality of selectable sensors, each indication and setting device being operable to indicate the current actual value of and to set a set value for each operating parameter sensed by its associated sensor or sensors;

a controller and switchover system configured to control the at least one position characteristic conditioned on set value or values and sensed current actual value or values of the operating parameter or parameters sensed by a selected subset of the plurality of selectable sensors by returning at least one adjustment value to adjust the at least one position characteristic so that the sensed current actual value or values of the operating parameter or parameters approach the set value or values for the selected subset of the plurality of selectable sensors; and

the controller and switchover system being configured to switch over from control based upon a first selected subset of the plurality of selectable sensors to control based upon a second selected subset during milling operation without interruption of the milling operation and without any erratic alteration of the at least one adjustment value, the second selected subset exchanging at least one replacement sensor not in the first subset for at least one replaced sensor that was in the first subset.

('395 Patent at 7:2-41.)

44.     On November 27, 2019, the PTAB issued a Final Written Decision invalidating Claim 1 of the '395 Patent as obvious. In that action, Caterpillar argued that Claim 1 of the '395 Patent was obvious in light of two prior art sources (Davis[4] and Brabec[5]). (D.I. 369-23 at 20-21.) The PTAB invalidated Claim 1 of the '395 Patent because it "merely recite[d] a combination of well-known prior art elements that perform their known functions to produce predictable results." (D.I. 369-23 at 8.) It held that a "POSITA would merely need to incorporate Brabec's sensor swap functionality into Davis's controller system to arrive at the claimed invention of the '395 patent." (D.I. 369-23 at 25 (emphasis removed).)

45.     The PTAB expressed no opinion as to when the invention disclosed in Claim 1 of the '395 Patent requires that the selection and setting occur.

46.     The PTAB's decision did not discuss whether prior art disclosed a switchover device operable to preselect a replacement sensor and to pre-set a operating parameter prior to effecting a switchover.

**B.     Conclusions Of Law**

47.     Collateral estoppel precludes a party from contesting a matter that it had a full and fair opportunity to previously litigate. "When assessing the doctrine in a patent case, a district court must apply regional circuit law to the general procedural question

---

[4] U.S. Patent Pub. No. 2002/0047301.
[5] U.S. Patent Pub. No. 2002/0154948.

of whether collateral estoppel applies." *Kroy IP Holdings, LLC v. Groupon, Inc.*, No. CV 17-1405-MN-CJB, 2022 WL 17403538, at *4 (D. Del. Dec. 2, 2022). Federal Circuit law controls when substantive issues of patent law arise. *See Biogen Int'l GmbH v. Amneal Pharms. LLC*, 487 F. Supp. 3d 254, 263 (D. Del. 2020) (citing *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)).

48.     In the Third Circuit, collateral estoppel applies when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006). Caterpillar, "as the party seeking ... estoppel has the burden of demonstrating the propriety of its application." *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000).

49.     Claim 1 of the '395 Patent (adjudicated) and Claim 5 of the '788 Patent (unadjudicated) are not identical, so there's a question of whether the PTAB's decision is the kind of decision that gets preclusive effect.

50.     Certainly, if the PTAB were to invalidate identical claims in the same litigation, preclusion would apply. *See Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1250 (Fed. Cir. 2019). The Federal Circuit has held that "a decision *by a court* invalidating one patent may collaterally estop the litigant from asserting the validity of materially similar, unadjudicated claims in litigation." *M2M Sols.*

*LLC v. Sierra Wireless Am., Inc.*, No. CV 14-1102-RGA, 2020 WL 7767639, at *6 (D. Del.

Dec. 4, 2020), *report and recommendation adopted*, No. 14-CV-01102-RGA, 2021 WL

7441706 (D. Del. Mar. 31, 2021) (citing *Ohio Willow Wood Co.*, 735 F.3d at 1342). But the

Federal Circuit hasn't gone as far as extending this holding when the PTAB is the

decisionmaker. *See id.*

51.     Many courts have held that the PTAB's invalidation of a substantially

similar claim can't be given preclusive effect. *See, e.g., IOENGINE, LLC v. PayPal Holdings,

Inc.*, 607 F. Supp. 3d 464, 489 (D. Del. 2022) (Bryson, J.) (collecting cases); *but see

Fellowes, Inc. v. Acco Brands Corp.*, No. 10 CV 7587, 2019 WL 1762910, at *6 (N.D. Ill.

Apr. 22, 2019). I find those cases persuasive. The PTAB finds invalidation using a

preponderance of the evidence standard. But in court, a party seeking to invalidate a

patent must do so by clear and convincing evidence. *See IOENGINE, LLC*, 607 F. Supp.

3d at 489. Collateral estoppel is inappropriate when "the burden of proof on an issue in

the prior proceeding was less stringent than the burden of proof on the issue as to

which preclusion is sought in the second proceeding." *Id.* at 488. I conclude that

collateral estoppel doesn't apply to Wirtgen's claim that Caterpillar infringed Claim 5 of

the '788 Patent.

52.     This conclusion—that collateral estoppel does not apply based on

differing burdens of proof—is not novel, nor is it limited to patent law. For example, an

individual might obtain an acquittal in a criminal trial (where he only has to demonstrate

reasonable doubt), but the government authorities remain free to assert actual guilt as a defense in a subsequent civil suit under section 1983 (where the same individual has to prevail on a preponderance of evidence standard). *See Chisholm v. Def. Logistics Agency*, 656 F.2d 42, 48 n.11 (3d Cir. 1981).

53.     Even if I were to hold that collateral estoppel *could* apply in theory, I would still find that Caterpillar hasn't shown that Claim 1 of the '395 Patent and Claim 5 of the '788 Patent are substantially similar.

54.     For the identity of the issues prong, in the context of invalidity, collateral estoppel is not limited to instances where claim terms are identical. *See Ohio Willow Wood Co.*, 735 F.3d at 1342. Rather, when differences between unadjudicated patent claims and adjudicated ones "do not materially alter the question of invalidity[,]" collateral estoppel may apply. *See id.*; *see also Google LLC v. Hammond Dev. Int'l, Inc.*, 54 F.4th 1377, 1381 (Fed. Cir. 2022). A court must therefore "determine whether the invalidated patent claims are 'substantially similar' to the unadjudicated patent claims." *TQ Delta, LLC v. 2Wire, Inc.*, No. CV 13-1835-RGA, 2021 WL 2671296, at *5 (D. Del. June 29, 2021) (quoting *Ohio Willow Wood Co.*, 735 F.3d at 1342).

55.     The Parties dispute whether Caterpillar has met the first requirement for collateral estoppel: identical issues in both cases. The PTAB invalidated Claim 1 of the '395 Patent. To Caterpillar, this estops Wirtgen from now asserting Claim 5 of the '788 Patent. To reach that conclusion, Caterpillar argues that Claim 1 of the '395 Patent is

substantially similar to Claim 1 of the '788 Patent. In turn, Claim 1 of the '788 Patent is substantially similar to Claim 5 of that patent. So, stringing it all together, Claim 1 of the '395 Patent is sufficiently similar to Claim 5 of the '788 Patent.

56.     Much of Caterpillar's argument relies on an expert declaration that I have stricken. Without that declaration, its argument falls apart because it cannot draw the connections that it needs to demonstrate collateral estoppel by clear and convincing evidence (or even by a preponderance of the evidence).

57.     Even if I did consider Dr. Smith's declaration, the outcome would be the same. The PTAB invalidated Claim 1 of the '395 Patent. Even assuming that Claim 1 of the '788 Patent is substantially similar, Claim 5 of the '788 Patent adds limits that narrow the claim (pre-setting and pre-selecting) and that were not before the PTAB. As a matter of law, the invalidation of Claim 1 (the broader claim) does not doom the narrower one. *Cf. Kroy IP Holdings, LLC,* 2022 WL 17403538, at *7 n.9.

58.     In addition, Dr. Smith's reading of the '788 Patent's specification to suggest that Claim 1 only includes the possibility of selecting a senor and setting its operating parameters prior to initiating a switchover is not enough to satisfy the clear and convincing evidence standard. There's some support for his position in the specification, but the specification's explanation that it is "possible" in all embodiments for selecting/setting to occur before the switchover does not mean that Claim 1 eliminates the possibility of selecting/setting occurring after the switchover. (D.I. 367 ¶

64.) Claim language is not limited to its embodiments, though. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). Given the possibility (even likelihood) that the specification is not the only embodiment that the claim language covers, Dr. Smith's declaration could not constitute clear and convincing evidence, even if I considered it.

## IV.     CONCLUSION

Caterpillar has not carried its burden on any of its equitable defenses. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

August 21, 2024